**Richard M. RAGSDALE, et al., Plaintiffs–Appellees,**

v.

**Bernard J. TURNOCK, Director of the Illinois Department of Public Health, et al., Defendants–Appellants.**

**No. 85–3242.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 22, 1986.

Decided March 10, 1988.

As Amended April 13, 1988.

Kathleen T. Kreisel, Ill. Atty. Gen. Office, Chicago, Ill., for defendants-appellants.

Colleen K. Connell, American Civil Liberties Union, Alan S. Gilbert, Lorie A. Chaiten and Susan M. Kornfield, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for plaintiffs-appellees.

1. Class certification as to both the defendant and plaintiff classes was challenged below. The district court granted certification. 625 F.Supp. at 1219–24. That ruling is not challenged on appeal.

Before BAUER, Chief Judge, COFFEY, Circuit Judge, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

Plaintiffs consist of a class of all duly licensed physicians and surgeons performing or who desire to perform pregnancy terminations in Illinois and a class of all women in the State of Illinois of child-bearing age who desire or may desire an abortion at sometime in the future. Defendants are a class of the State's Attorneys of all of the counties of the State of Illinois,[1] the Director of the Illinois Department of Public Health, the Illinois Attorney General, and the Director of the Illinois Department of Registration and Education. Plaintiffs sued under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201–02, seeking declaratory and injunctive relief to the effect that three Illinois statutes and the regulations thereunder violate the constitutional right to privacy, specifically to abortion, as established in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and subsequent Supreme Court cases. This case comes to us on appeal from the district court's grant of plaintiffs' motion for a preliminary injunction. 625 F.Supp. 1212 (N.D.Ill.1985). Because we believe certain of the claims are moot, we vacate in part. In most respects, however, we affirm the preliminary injunction.

## I

### A. Statutory and Regulatory Provisions

The statutory and regulatory scheme is somewhat complex. Therefore, we set it out in some detail. Section 16(1) of the Medical Practice Act ("the MPA"), 111 Ill. Rev.Stat. ¶ 4433(1), allows for revocation or suspension of the license of any physician who performs an "elective abortion" in any place other than a licensed Ambulatory Surgical Treatment Center ("ASTC"), a hospital, or a facility run by the state or federal governments.[2] The Ambulatory

2. Section 16(1) of the Medical Practice Act reads, in pertinent part:
   The Department may revoke, suspend, place on probationary status, or take any other disciplinary action as the Department may deem proper with regard to the license ... of any

Surgical Treatment Center Act, 111½ Ill. Rev.Stat. ¶¶ 157–8.1, *et seq.* (the "ASTCA" or the "Act"), provides for the licensure of all ASTCs, which it defines as "any … place … devoted primarily to … the performance of surgical procedures or any facility in which a medical or surgical procedure is utilized to terminate a pregnancy, irrespective of whether the facility is devoted primarily to this purpose…." 111½ Ill.Rev.Stat. ¶ 157–8.3(A). In addition, plaintiffs have challenged those sections of the Health Facilities Planning Act, 111½ Ill.Rev.Stat. ¶¶ 1151, *et seq.* ("HFPA"), which require anyone seeking to open an ASTC to obtain a certificate of need for the facility from the Department of Public Health after a public hearing and 120–day review period. *See* 111½ Ill.Rev.Stat. ¶¶ 1155–1160.[3]

The bulk of plaintiffs' specific challenges, however, are directed at the ASTCA and the regulations promulgated thereunder, and their application, via the MPA, to physicians desiring to perform first and early second trimester abortions. Accordingly, we set forth the ASTCA and its accompanying regulations in some detail.[4]

The Act itself is largely procedural in operation and grants the Department of Public Health the authority to promulgate specific regulations governing ASTCs. 111½ Ill.Rev.Stat. ¶ 157–8.10. However, certain specific provisions of the statute also prescribe requirements for ASTCs. Section 6.1 of the ASTCA requires any

corporation operating an ASTC devoted primarily to providing facilities for abortion to have on its board of directors a physician who is licensed to practice medicine in all of its branches and is actively engaged in the practice of medicine at the ASTC. Pars. 157–8.5 and 8.6 generally provide for licensing with an initial fee of $500 and an annual renewal fee of $300. Additionally, those sections require that a licensed facility be under the supervision of one or more physicians and that at least one physician have admitting and surgical privileges at an Illinois hospital. Pars. 157–8.7a and 8.7b require statements regarding the ownership of and financial condition of the facility. Par. 157–8.8 requires Department approval of construction of, alterations of, or additions to a facility. Par. 157–8.9 provides for quarterly inspections of facilities and provides for confidentiality of information received by the Department.

The remedial sections of the Act provide an array of enforcement mechanisms. Par. 157–8.9a provides that a facility may be closed by administrative order if its continued operation constitutes an imminent and serious menace to the health or safety of the patients or if the operator thereof has been convicted of a violation of par. 157–8.-12. Par. 157–8.12 provides for a fine of $10,000 per day for operating a facility without a license or otherwise violating the Act. Par. 157–8.13 makes the operation of a facility in violation of the Act or regula-

---

person … in this state to practice medicine … upon any of the following grounds:

(1) Performance of an elective abortion in any place … other than:

(a) a facility licensed pursuant to the "Ambulatory Surgical Treatment Center Act" …;

(b) [a licensed hospital];

(c) an ambulatory surgical treatment center or hospitalization or care facility maintained by the State or any agency thereof …;

(d) ambulatory surgical treatment centers, hospitalization or care facilities maintained by the Federal Government, or

(e) ambulatory surgical treatment centers, hospitalization or care facilities maintained by any university or college established under the laws of this State and supported principally by public funds raised by taxation….

**3.** Section 1158 of the Health Facilities Planning Act reads, in pertinent part:

… When an application for a permit is initially reviewed by a recognized areawide health planning organization or [the Department of Public Health] … [they] shall afford an opportunity for a public hearing within a reasonable time after receipt of the complete application…. Such hearing shall be conducted in the area or community where the proposed project is to occur, and shall be for the purpose of allowing the applicant and any interested person to present public testimony concerning the approval, denial, renewal or revocation of the permit…. The State Board shall promulgate reasonable rules and regulations governing the procedure and conduct of such hearings.

**4.** Selected regulations that are discussed in detail in our analysis *infra* in the text are set forth in an Appendix to this opinion.

tions a public nuisance subject to injunction.

Par. 157–8.15 provides, in broad terms, for severability of the provisions of the Act.

The general regulations under the AST-CA, found in Title 77 of the Illinois Administrative Code, are detailed and govern many aspects of an ASTC.

For example, there are quite specific physical plant regulations which require: (1) a minimum size of 250 sq. ft. for at least one procedure room (any additional ones must be no smaller than 120 sq. ft.) and a minimum of 80 sq. ft. for examinations rooms; (2) that an ASTC be "identifiably separate from other medical facilities and functions"; (3) that a "control station" be located to allow visual surveillance of traffic entering the operating suite; (4) that facilities including a lounge, lockers, separate toilets, and a space for changing clothes be provided for male and female personnel; (5) a separate janitorial closet for the surgical suite; (6) a "diagnostic facility" if pre-admission evaluation tests are to be performed; and (7) minimum corridor (5' or 8' depending on whether stretchers are to be used) and door (3' or 3'8") widths. § 205.1310–1390. Also, an elaborate air-conditioning, heating, and ventilation system to provide for specific filter efficiencies and airflow relationships between rooms is required. § 205.1540 and Table A.

The licensure regulation provides for a detailed application including identification of the owners and operators of the facility, its location, a description and architectural plans, documentation of compliance with building and safety codes, a description of the services to be performed, and a list of all personnel and their qualifications. A new application is required for a change in ownership, location of the facility, remodeling, or addition of services or programs. Notice to the Department must be given of any change in the administrative staff, medical director, staff physicians, supervising nurse, addition or deletion of surgical procedures, or change in any shareholder

interest of five percent or more. § 205.120.

Other general requirements include an organizational plan which is available for public information, a policies and procedures manual, and written personnel policies including job descriptions. § 205.310. All facilities are required to have the following personnel present during the operative and post-operative period for all patients: a physician, a registered professional nurse with post-graduate education or experience in surgical nursing, and a person certified in "Basic Life Support" by the American Heart Association. Sections 205.320–40. Additionally, each facility must have either a certified medical technician or a written agreement with a licensed laboratory to perform required laboratory procedures. § 205.350. A consulting committee must be established to develop standards of professional work and a physician must serve as the medical director of the facility. § 250.230.

With regard to equipment, all facilities are required to have monitoring equipment, suction apparatus, oxygen, and cardiac pulmonary resuscitation equipment. § 205.410. Additional written procedures are required to govern care, use, sterilization, storage and disposal of all materials, and to govern storage and use of all medications. *Id.* Additional written procedures are required for garbage and refuse removal, insect and rodent control, and maintenance of heating, ventilation and utility service. § 205.420.

Patient care regulations include a requirement of a written "emergency" procedure in case of fire, explosion, or "other non-patient medical emergency," and preparation to manage the emergencies normally associated with the surgical procedures performed. § 205.510. A "complete physical" is required and specified tests are required to be performed by a qualified laboratory technician for any procedures performed under general anesthesia, local anesthesia with sedation, or any pregnancy termination. A signed, written informed consent for any procedure is to be maintained with the patient's clinical records.

§ 205.520. All removed tissues are to be examined by a consulting pathologist. § 205.530.

Post-operative care regulations provide that any patient who has had general anesthesia, local anesthesia with sedation, or pregnancy termination is required to be observed for a period of time sufficient to detect any immediate post-operative complications, and that no patient be required to leave in less than one hour. § 205.540. Additionally, written documentation is required of a transfer agreement with a licensed hospital within fifteen minutes of the facility, or that the medical director of the ASTC (or each staff physician of the ASTC) has admitting privileges at such a hospital. § 205.540.

Detailed clinical records are also required to be maintained. § 205.610. Additionally, facilities are required to make annual statistical reports that include the number and type of procedures performed, the number and type of complications reported, the number of patients requiring transfer to a hospital due to complications, the number of patients returning for follow-up, and the number of deaths.

The regulations also have an abortion-specific subpart which requires: (1) at least one registered professional nurse with post-graduate education or experience in obstetrical or gynecological nursing, section 205.720; (2) testing and reporting of the results to the patient of blood Rh factor and diagnosis of pregnancy, section 205.-730(a); and (3) counseling by someone specifically trained to give it and who has no financial interest in the patient's decision, which counseling must include a discussion of alternatives, description of the procedure to be performed, and an explanation of risks and possible complications, section 205.730(b). Contraceptive information may be provided post-operatively, and shall be provided if desired by the patient. *Id.* Counseling must take place in a room separate from the procedure room, and a record of the counseling given is to be included in the patient's clinical record. *Id.* The subpart contains its own reporting requirement which requires monthly reporting of each procedure "on forms provided by [the Department]." Additionally, the regulations prohibit an ASTC from performing abortions on patients with a gestational age exceeding twelve weeks. § 205.740.

**B. Enforcement Policies**

Not all of the provisions of challenged statutes and regulations are being enforced. Since 1981, the Act and regulations have been applied only to facilities which are primarily devoted to the performance of surgical procedures (including abortions). This enforcement policy was adopted in response to *Village of Oak Lawn v. Marcowitz,* 86 Ill.2d 406, 55 Ill. Dec. 916, 427 N.E.2d 36 (1981), which refused to enforce, in a criminal proceeding, that portion of a local ordinance which incorporated the ASTCA definition of an ASTC which covered "any facility where a medical or surgical procedure is performed for the termination of pregnancy, regardless of whether the facility is primarily devoted to that purpose." The defendants also contend that the MPA's revocation or suspension sanction for performing abortions outside an ASTC is similarly not being enforced, but the evidence on this point is equivocal.

The defendants also contend that the prohibition on performance of second trimester abortions in ASTCs is not being enforced because it was considered enjoined by the order in *Paula Poe v. IDPH,* No. 78–C–4126 (N.D.Ill.1982). In that case, enforcement of section 4 of the Illinois Abortion Law of 1975, 38 Ill.Rev.Stat. ¶ 81–24, which required all second trimester abortions to be performed in a hospital, along with "any related regulation" was enjoined pending decision of three Supreme Court cases involving a second trimester hospitalization requirement. *Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983); *Planned Parenthood Association, Inc. v. Ashcroft,* 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983); and *Simopoulos v. Virginia,* 462 U.S. 506, 103 S.Ct. 2532, 76 L.Ed.2d 755 (1983). An internal memorandum of the Department of Public Health following the decisions in those cases

opined that they confirmed the unconstitutionality of the second trimester hospitalization requirement in the Illinois statutes and regulations. *See* Deft. Ex. 4. Representatives of the defendants testified at trial that the requirement is not currently being enforced for this reason.

Defendants also contend that section 10 of the Illinois Abortion Law of 1975, an abortion-specific reporting requirement, was enjoined by Judge Kocoras in *Charles v. Carey*, 579 F.Supp. 464 (N.D.Ill.1983), *aff'd in part, rev'd in part on other grounds Charles v. Daley*, 749 F.2d 452 (7th Cir.1984) (*Charles II*), *appeal dismissed sub nom. Diamond v. Charles*, 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986), and that the abortion-specific reporting requirement in the ASTC regulations has not been enforced since that time.

These non-enforcement policies are not publicly stated, but persons who inquire of the various enforcement agencies are informed of them.

## C. Individual Plaintiff Dr. Ragsdale

The individual plaintiff physician was required to relocate his practice, the Northern Illinois Women's Center ("the NIWC"), which is the only facility of its kind (that is, a non-hospital clinic) offering abortion services in a large area of northwestern Illinois because his landlord refused to renew his lease. The facility which he had been operating was not in full compliance with the ASTCA regulations, but was nonetheless licensed as "substantially complying" with them. When he sought another location, he had to go through the certificate-of-need proceedings. The required public hearing on the application degenerated into a shouting match between "pro-choice" and "pro-life" members of the public, after which the doctor's prospective landlord withdrew his lease commitment. In addition, officials charged with enforcing the regulations told him that they would require "considerably more substantial compliance" than had been the case with his prior facility, particularly with respect to the architectural requirements. The cost of either building a facility or renovating one to comply with the regulations was estimated by the plaintiff at between $25.21 and $47.66 per patient. Because of his inability to find a location that can be renovated to comply with the ASTCA, particularly the structural and physical plant requirements of the regulations, at a reasonable cost, Dr. Ragsdale will close the NIWC unless the statute is enjoined.

## D. Individual Plaintiff Margaret Moe

Margaret Moe is a registered nurse who currently operates two medical facilities in the State of Illinois. The facilities offer family planning education and medical care that includes the prescription of contraceptives, prenatal care, and delivery assistance for pregnant women. Her clinics receive approximately sixty requests for abortions each week. She would like to offer abortion services at her clinics, and she has on staff physicians who are competently trained and willing to perform such abortions. However, her facilities do not comply with the structural requirements of the Act and regulations and cannot be renovated to so comply without prohibitive cost. Accordingly, she does not offer such services.

## II

We first consider whether certain of plaintiffs' challenges have been mooted by the State's non-publicized policy of non-enforcement.[5] It is well established that voluntary cessation of putatively illegal conduct ordinarily will not moot a controversy and prevent its adjudication by a federal court. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 & n. 10, 102 S.Ct. 1070, 1074 & n. 10, 71 L.Ed.2d 152 (1982); *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379,

---

5. We note that the defendants did not argue that portions of the case were moot until their reply brief, arguing in their initial brief only that the non-enforcement policy meant that the plaintiffs were not being irreparably harmed by the statutory scheme. Nonetheless, as we are under a duty to determine our own jurisdiction, we must consider the question of mootness even if no party properly raises it.

1383, 59 L.Ed.2d 642 (1979); *United States v. W.T. Grant Co.,* 345 U.S. 629, 632–33, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *see also Charles v. Daley,* 749 F.2d 452, 456–58 (7th Cir.1984) *(Charles II ), appeal dismissed sub nom., Diamond v. Charles,* 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). However, such cessation does render a controversy moot where there is no reasonable expectation that the putatively illegal conduct will be repeated, and there are no remaining effects of the alleged violation. *Davis,* 440 U.S. at 631, 99 S.Ct. at 1383; *W.T. Grant,* 345 U.S. at 633, 73 S.Ct. at 897. Defendants bear a heavy burden of persuading the court that a controversy is moot. *United States v. Phosphate Export Association, Inc.,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968); *W.T. Grant,* 345 U.S. at 633, 73 S.Ct. at 897; *Charles II,* 749 F.2d at 457; *Sanchez v. Edgar,* 710 F.2d 1292, 1294–95 (7th Cir.1983).

We note additionally that cessation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties. According to one commentator, such self-correction provides a secure foundation for a dismissal based on mootness so long as it appears genuine. *See* 13A Wright, Miller & Cooper *Federal Practice and Procedure* § 3533.7, at 353 (2d ed. 1984).

## A.

■ We believe that application of these general principles to the present circumstances mandates a conclusion that plaintiffs' challenge to the second trimester hospitalization requirement is moot. As we have noted above, the defendants have conceded, at least since 1983, that this requirement is unconstitutional under governing Supreme Court decisions and is therefore not enforced. Plaintiffs have not attempted to counter the defendants' showing on this point, nor do we believe they could. The individual plaintiff Dr. Ragsdale testified that he was informed by a State inspector that the hospitalization requirement was not being enforced and that after that time he began performing early second trimester abortions at his facility.

■ Analogous assurances of discontinuance of the challenged conduct have been held to render challenges moot in other cases. For example, in *McCrary v. Poythress,* 638 F.2d 1308 (5th Cir.), *cert. denied,* 454 U.S. 865, 102 S.Ct. 325, 70 L.Ed. 2d 165 (1981), election officials conceded that they had erred by attempting to compel a political candidate to file certain financial disclosure reports and wrote the candidate abandoning their request for such reports. This, according to the court, mooted the challenge to the officials' action because "Appellant 'has presented no evidence creating a reasonable expectation that the [Commission] will repeat its purportedly unauthorized actions in subsequent elections. Appellant's conclusory assertions that the actions are capable of repetition are not sufficient....' " *Id.* at 1310 & n. 1 (quoting *Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 187, 99 S.Ct. 983, 992, 59 L.Ed.2d 230 (1979)). In *Northern Virginia Women's Medical Center v. Balch,* 617 F.2d 1045 (4th Cir.1980), an even more questionable assurance of discontinuance was held to moot the controversy. There, a local prosecuting attorney's policy of not enforcing a state trespass statute against anti-abortion protestors who unlawfully entered and blocked access to an abortion clinic was challenged as a denial of Equal Protection. The court held that the prosecutor's assertion at oral argument that the non-enforcement policy had been abandoned, coupled with the fact that prosecutions had in fact occurred during the pendency of the litigation, rendered the challenge moot. According to the court, "[s]ince the good faith of this representation is not questioned, we conclude that the controversy between the Center and the commonwealth attorney is now moot and that it is not likely to be revived." *Id.* at 1049.

We believe that the defendants' now public policy of non-enforcement of the hospitalization requirement, particularly in view of the reasons therefor (*i.e.,* that enforce-

ment is barred by clear Supreme Court precedent), moots any challenge to that requirement. While we share plaintiffs' concern that the State has not acted to remove or amend the statute and regulations, we know of no authority by which we can require it to do so. The most we could do, and all plaintiffs request of us, is to enjoin their enforcement. Federal courts do not, as a rule, enjoin conduct which has been discontinued with no real prospect that it will be repeated. Accordingly, the challenge to the second trimester hospitalization requirement should have been dismissed. Therefore we vacate the portion of the injunction that pertains to it.

## B.

■ However, we do not believe that the challenge to the reporting requirement of the ASTCA and regulations is moot. Although defendants testified that this requirement is no longer being enforced in light of *Charles v. Carey*, 579 F.Supp. 464 (N.D.Ill.1983), we have reviewed that decision and cannot find anything in it which remotely supports the conclusion that the requirement under challenge here was enjoined. The only reporting requirement addressed by that decision was section 11(d) of the Illinois Abortion Act, which required the reporting to the Department of the name of any patient diagnosed as having complications from abortion. The more general requirements here are quite different. Unlike its representations of non-enforcement of the other sections, the State produced no pre-existing documentation of the policy. We share the district court's concern that the State's position on this provision is asserted only in this litigation.

## C.

■ The challenge to the application of the ASTCA and regulations to first trimester abortions is similarly not moot. While the requirement is apparently no longer applied to the "occasional" abortion provider, the State continues to maintain that it is free to apply the ASTCA to abortion providers whose practice is "primarily devoted to" performing surgery, even if that "surgery" consists exclusively of first trimester abortions. This is in fact the situation facing at least one of the named plaintiffs, Dr. Ragsdale.

Additionally, the evidence regarding the suspension/revocation sanction in the MPA was, as we have noted, ambiguous. A representative of the Department merely testified that any complaint regarding this provision would be "examined by the General Counsel's office for a determination of whether there would be any enforcement action taken pursuant to that section." He additionally testified that "to the best of [his] knowledge" the Department would not enforce the section. While we admit that it would be anomalous for the Department to take the position that "occasional" abortion providers need not be licensed but that performance of such abortions could subject the physicians to revocation of their licenses to practice medicine, the Department's position is sufficiently murky and the sanctions sufficiently severe, that we believe a live controversy exists regarding this requirement. Doctors should not have to risk loss of their professional licenses to explore the contours of the asserted non-enforcement position.

## III

On the merits,[6] we must consider whether the requirements of the statutory and

---

6. On appeal, various of the defendants and amici contend that the district court did not properly weigh various of the factors which are normally considered in issuing a preliminary injunction. We note that the presentation of the case below focused almost exclusively on the constitutionality *vel non* of the statutory scheme or its component parts. However, the district court undertook a thorough examination of the traditional factors governing the granting of preliminary relief, i.e., the lack of an adequate remedy at law, irreparable harm, balance of harms, likelihood of success on the merits, and the public interest. We confine our discussion to the likelihood of success on the merits, that is, the governing legal standards and their relationship to the facts found below for two related reasons. First, the balancing of the other factors is typically reviewed on an "abuse of discretion standard" and we see no abuse, and second, we find insufficient merit to any of the defendants' or the amicus' belated assertions that this or that factor was given insufficient weight to add to this already lengthy opinion.

regulatory scheme violate the right to privacy (and to abortion) as established in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 710, 35 L.Ed.2d 147 (1973), and its progeny. In *Roe*, the Court first set out the now familiar "trimester" approach:

(a) For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician.

(b) For the stage subsequent to approximately the end of the first trimester, the State, in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health.

(c) For the stage subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.

410 U.S. at 164–65, 93 S.Ct. at 732.

In elaborating on this approach, the Court noted that the State's interest in the health of the mother becomes compelling: in the light of present medical knowledge, ... at approximately the end of the first trimester. This is so because of the now-established medical fact, ... that until the end of the first trimester mortality in abortion may be less than mortality in normal childbirth. It follows that, from and after this point, a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health. Examples of permissible state regulation in this area are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic or some other place of less-than-hospital status; as to the licensing of the facility; and the like.

This means, on the other hand, that, for the period of pregnancy prior to this "compelling" point, the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated. If that decision is reached, the judgment may be effectuated by an abortion free of interference by the State.

*Id.* at 163, 93 S.Ct. at 731–32.

Since *Roe*, the Court, along with the lower federal courts, has on numerous occasions clarified the constitutional standards which apply to regulations aimed at both first and second trimester abortions. Few restrictions on first trimester abortions have been upheld. For example, the Court upheld a requirement that all abortions be performed by a licensed physician. *Connecticut v. Menillo*, 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975) (*per curiam*). This requirement, apart from being endorsed in *dictum* in *Roe*, was upheld because "the State retains an interest in ensuring the validity of Roe's factual assumption that 'the first trimester abortion [is] as safe for a woman as normal childbirth at term,' an assumption that 'holds true only if the abortion is performed by medically competent personnel under conditions insuring the maximum safety of the woman.'" *Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 430 n. 12, 103 S.Ct. 2481, 2492 n. 12, 76 L.Ed.2d 687 (quoting *Menillo*, 423 U.S. at 11, 96 S.Ct. at 171).

Likewise, the Court upheld a state-required pathology examination which required tissues removed by abortion, like all other removed tissues, to be examined by a pathologist. *Planned Parenthood Association, Inc. v. Ashcroft*, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983). This was because such an examination was con-

sidered "absolutely necessary" from a medical standpoint and "'abnormalities in the tissue may warn of serious, possibly fatal disorders.'" *Id.* at 487–89, 103 S.Ct. at 2523–24. According to the Court, certain regulations of even first trimester abortions that "'have no significant impact on the woman's exercise of her right [to have an abortion] may be permissible where justified by important state health objectives.'" *Id.* at 489–90, 103 S.Ct. at 2524 (quoting *Akron,* 462 U.S. at 430, 103 S.Ct. at 2492–93 (alterations by the Court)).

■ The quoted language clearly indicates that, where first trimester abortions are involved, not only must the impact of the challenged regulation be insignificant in terms of the woman's exercise of her right, but also that the regulation must be "justified by important state health objectives." This is consistent with our own case law to the effect that once such regulations are shown to have more than a *de minimus* impact on the abortion decision, the government must show a compelling basis for the law, *i.e.,* that the burden is not undue or unjustifiable. *Charles v. Carey,* 627 F.2d 772, 777 (7th Cir.1980) (*Charles I*), *on remand,* 579 F.Supp. 464 (N.D.Ill.1983).[7]

Appellants contend that the district court's application of a "medical necessity" standard was error. We disagree. First, we believe that a "medical necessity" standard, at least as the term was used in the testimony below, is entirely consonant with the standards to be applied to regulations regarding first trimester abortions. *See Akron,* 462 U.S. at 430, 103 S.Ct. at 2492–93 (such restrictions must be "justified by

important state health objectives"); *Ashcroft,* 462 U.S. at 487, 103 S.Ct. at 2523 (pathology examination requirement upheld because "absolutely necessary" from a medical standpoint). Additionally, it is clear from a review of the transcript that when the experts below testified that a requirement was not "medically necessary," they meant by that term that it had no real relationship to safety or health. *See, e.g.,* R. Vol. I at 112 (testimony of Dr. Ragsdale) (certain provisions not medically necessary because without "any real relationship to the particular circumstances" of physician performing abortions). According to the testimony, the minimum size requirements for examination rooms, procedure rooms, recovery rooms, corridors and doors, for example, not only were not "medically necessary," but do not enhance the safety of the abortion procedure "in any way" or did not have "any medical justification." R. Vol. I at 263–72 (testimony of Dr. Hern); *see also* R. Vol. I at 154 (testimony of Dr. Ragsdale) (large procedure room "not only medically unnecessary but medically poor"). The district court found, with full support from the record, that the physical plant requirements of the regulations required ASTCs to be "the functional equivalent of small hospitals," 625 F.Supp. at 1216, and that these requirements "may be medically detrimental." *Id.* at 1230 n. 23.

■ We note as well that the question whether some or all of the requirements of the statute and regulations could be constitutionally applied to early second trimester abortions is a more nettlesome one, but it is a question which we need not decide.[8] The

---

7. Appellants make much of the fact that the district court connected the two parts of the *Charles I* dictum with "and" rather than "that is," claiming that the district court thus applied an improper standard. *See* 625 F.2d at 1230. This claim is meritless. *Charles I* in fact reiterated the standard enunciated by the Supreme Court, that the state must justify its regulation with a compelling interest and show that the regulation is narrowly drawn to express only that interest. *See* 627 F.2d at 776–78. Scrutiny of such laws always involves two questions: (1) how important the asserted state interest is, and (2) how well the regulation is drawn to achieve only that interest. *Charles I* did not intend to

suggest that the second inquiry was unnecessary, and appellants' reliance on it for that purpose is misplaced.

8. A number of the regulations involved may well pass muster under the less stringent standard of review applied to state regulation of second trimester abortions. That standard allows the state to regulate second trimester abortions to the extent that the regulation "reasonably relates to the preservation and protection of maternal health," but it may not "adopt abortion regulations that depart from accepted medical practice." *Akron,* 462 U.S. at 430–31, 103 S.Ct. at 2493. The experts who testified at hear-

statute and regulations do not distinguish between the two. Indeed, as written, due to the (now unenforced) second trimester hospitalization requirement, they originally applied *only* to first trimester abortions. Accordingly, as we have in other cases, we apply the legal standards applicable to restrictions on first trimester abortions. *See Charles I*, 627 F.2d at 782; *Friendship Medical Center, Ltd. v. Chicago Board of Health*, 505 F.2d 1141, 1149 (7th Cir.1974), *cert. denied*, 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975). We are simply not at liberty to insert the words "except with regard to first trimester abortions" into either the statute or the regulations. To do so would result in a scheme with little resemblance to that enacted by the Illinois legislature or the Department of Public Health. *See Thornburgh v. American College of Obstetricians*, 476 U.S. 747, 106 S.Ct. 2169, 2181, 90 L.Ed.2d 779 (1986).

■ Defendants suggest that, because the regulations apply to all facilities primarily devoted to surgery, we must review them under a different standard than if they had singled out abortions. We disagree. Defendants have cited us to no cases, and we have found none, which would justify such a distinction. In fact, *Friendship* suggests, albeit in *dictum*, exactly the opposite. 505 F.2d at 1153–54; *see also Birth Control Centers, Inc. v. Reizen*, 743 F.2d 352, 361–62 (6th Cir.1984) (applying strict scrutiny notwithstanding general applicability of regulations).

We adhere to the statement in *Friendship* for several reasons. First, we cannot ignore the fact that the ASTCA was enacted primarily with abortion clinics in mind and only applied to outpatient surgical clinics generally in an effort to save the statute from unconstitutionality. *See* Pf. Ex. 22–24 (minutes of ASTC Licensing Board meetings). Secondly, the State cannot, merely by applying the expedient and conclusory label "surgery" to a medical procedure, apply requirements which would be necessary to major surgical procedures in

ing described many of the requirements as "consistent with accepted medical practice." While it is true, as the district court found, that "[t]his is not equivalent to a showing of medical necessity," such a showing is not required for regulations which apply only to the second trimester.

We note that the Supreme Court stated in *Roe* that the state's interest in maternal health during the second trimester extends to "the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic of some other place of less-than-hospital status; as to the licensing facility; and the like." 410 U.S. at 163, 93 S.Ct. at 732. Further, in *Simopoulos v. Virginia*, 462 U.S. 506, 103 S.Ct. 2532, 76 L.Ed.2d 755 (1983), the Court rejected an attack on a criminal conviction, upholding against a charge of facial invalidity a statute requiring all second trimester abortions to be performed in a "hospital," where that term was defined to include facilities which were not full-fledged acute care hospitals. Thus, it appears that at least some licensing of facilities performing second trimester abortions would be permissible. However, we caution that the Court in *Simopoulos* specifically noted that "[w]e need not consider whether Virginia's regulations are constitutional in every particular.... [A]ppellant has not attacked them as being insufficiently related to the State's interest in protecting health." *Id.* at 513, 103 S.Ct. at 2539. Also, *Simopoulos*, unlike the present case, involved a late second trimester abortion performed using the saline instillation method.

Much of the testimony below was to the effect that the requirements of the regulations bore

little relationship to safe performance of early second trimester abortions as well as first trimester abortions. This should come as little surprise, since the medical procedures utilized are quite similar if not identical. We remind the State of the Supreme Court's admonition in *Akron* that:

> [I]f it appears that during a substantial portion of the second trimester the State's regulation "depart[s] from accepted medical practice," supra [103 S.Ct.], at 2493, the regulation may not be upheld simply because it may be reasonable for the remaining portion of the trimester. Rather, the State is obligated to make a reasonable effort to limit the effect of its regulations to the period in the trimester during which its health interest will be furthered.

462 U.S. at 434, 103 S.Ct. at 2495.

Thus, while the trimester approach remains the applicable legal framework for weighing the competing interests involved in the abortion decision, it does not necessarily follow that all state regulations of abortion which are keyed to it are reasonable. Instead, the state should endeavor to draw its regulations designed to further maternal health in medically relevant terms (for example, certain of the requirements of the statute involved here may well make sense for late second trimester abortions which are performed under a general anesthetic, but not for simple "dilation and evacuation" abortions performed early in the second trimester).

the abortion context where they would be wholly inappropriate. It is as much a vice to treat abortion similarly to dissimilar procedures as it is to treat it differently from analogous procedures. In either case, imposition of burdensome requirements which are completely unnecessary to the performance of safe abortions is attempted. A prime example of this problem is the fact that many of the physical plant requirements of the regulations are designed with procedures to be performed under general anesthesia in mind, although the testimony in this case clearly established that first and early second trimester abortions of the type at issue here are not usually performed using such anesthesia and that, in fact, the use of a general anesthetic increases the risk of death and major complications from such procedures.

With the standards enunciated above in mind, we now turn to evaluation of the constitutionality of the challenged statutes and regulations.

## IV

## A.

■■■■ The State initially contends that the plaintiffs have not met their threshold burden of showing an impact on the abortion decision. We must reject this contention. The district court found that the regulations at issue do substantially burden the effectuation of the decision to have an abortion. Specifically, the lower court found that the regulations raised the cost of abortions, by $25–$40 for abortions performed at Dr. Ragsdale's clinic, and, more importantly, that they would limit the availability of abortions in that, unless the regulations were enjoined, the clinic would close

for lack of a suitable location that could be renovated to comply with them.[9] Additionally, the district court found that the regulations prevented individual plaintiff Moe from offering abortion services at her clinic because the cost of compliance was prohibitive. We cannot say these findings are clearly erroneous.

■■■■ Dr. Ragsdale testified that he estimated compliance with the regulations would entail a per-patient cost of between $25 and $40.[10] While the defendants point out, correctly, that this is not a great deal more than the cost of the pathology examination upheld in *Ashcroft*, they seem to have missed the import of that case. The Court did not hold that the impact was so small that the state was not required to justify it at all. It merely held that, during even the first trimester, requirements having an insignificant impact on the abortion decision were constitutional "where justified by important State health objectives." Thus, the regulations at issue here, which have a *greater* financial impact than that in *Ashcroft*, must be justified by at least similar state interests.

Additionally, although the financial per-patient cost of compliance might not seem overwhelming, it is not the only burden which must be considered. The lack of availability of abortions caused by the upfront cost and difficulty of obtaining a complying facility is at least as real and possibly more burdensome to women seeking abortions. Furthermore, there was testimony of the psychological burdens which would result from having to undergo an abortion in a hospital-like facility when the more psychologically comforting setting of a doctor's office would serve just as well

The Americans United for Life Legal Defense Fund, as amicus curiae, contends that, because individual plaintiff Dr. Ragsdale would have had to relocate his clinic regardless of the regulations (due to an ostensibly unrelated business decision of his landlord), plaintiffs have presented no direct injury flowing from the challenged government conduct. However, this argument misses the critical point that the regulations make difficult, if not impossible, the relocation of an existing abortion practice or the commencement of a new one. As such, we have little doubt that plaintiffs have established

a sufficient injury both to satisfy Article III and to warrant the grant of injunctive relief.

10. Defendants place considerable emphasis on the allegedly erroneous admission of Dr. Ragsdale's handwritten cost estimates. We need not decide whether these constituted inadmissible hearsay, however, because Dr. Ragsdale testified at length, and without objection, to the substance of the estimates. Therefore, the admission of the written estimates themselves, if error, was surely harmless.

from a medical standpoint. We cannot say that these burdens are *"de minimus." Cf. Charles I,* 627 F.2d at 777 ("direct interference" is shown where impact is not *de minimus* or where regulation imposes restrictions "that did not already exist"). Therefore, they must be justified by important state health objectives.

### B.

The first facet of the scheme we consider is the requirement that facilities performing first trimester abortions be licensed at all. While this may not seem a particularly onerous requirement, we note Supreme Court precedent suggests only that a licensing requirement may be permissible in the second trimester. The Court stated in *Roe* that the state's interest in maternal health during the second trimester extends to "the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic of some other place of less-than-hospital status; as to the licensing of the facility; and the like." 410 U.S. at 163, 93 S.Ct. at 732. By contrast, the Court stated that during the first trimester "the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated. If that decision is reached, the judgment may be effectuated by an abortion *free from interference by the State." Id.* (emphasis added).

While we realize that the last quoted statement has been qualified by the Court in subsequent decisions (that is, where the "interference" does not have a significant impact and furthers important state health concerns), we nonetheless believe it retains force here. Thus, we are persuaded in this case that the State may not require separate licensure of facilities primarily devoted to performing abortions.

A primary factor which persuades us is that the State has in no way shown that performance of first trimester abortions in physicians' offices rather than heavily regulated ASTCs in any way undermines the safety of the operation. We further note that *Akron* itself seems to reject such an

argument. 462 U.S. at 429 n. 11, 103 S.Ct. at 2492 n. 11. The State in fact basically concedes that it cannot prevent doctors from performing at least some abortions in their offices.

To the extent that there is any basis for distinguishing between a doctor who occasionally performs an abortion in his office and one whose practice is primarily devoted to such procedures, the regulations appear to run contrary to sound health policy. All of the expert testimony in the record is in agreement that the physician who performs many abortions in general will have more expertise and therefore a better safety record. The State's attempt to regulate experienced, and therefore safer, physicians, more heavily than the occasional abortion provider thus appears, as the district court noted, to lack even a reasonable basis.

We realize that the Sixth Circuit upheld a similar general licensing requirement in *Reizen.* However, in doing so, the court did not address a challenge based on the constitutional right to abortion, but rather an Equal Protection challenge based upon the physician's right to practice. Accordingly, the court applied a highly deferential "rational basis" standard of review. 743 F.2d at 358–59. As we have already held, such a standard of review is not appropriate in this case. Additionally, none of the evidence of the type mentioned above was apparently present in *Reizen.* There, the district court found that a private physician was more likely to have direct control over staff and procedures, but that the absence of this control might characterize a "clinic." Such findings are absent in this case.

Purely as a matter of the plain language of the statutory and regulatory scheme, once the licensing requirement falls, the remainder of the requirements fall with it (or, more properly, are inapplicable). The specific substantive requirements are not (leaving aside the unenforced requirement that all abortions must be performed in an ASTC) applicable to abortions, *per se,* but rather to ASTCs. In the alternative, however, we analyze those specific substantive aspects of the regulations focused on at

trial which render the scheme unconstitutional as a whole.[11]

## C.

The abortion-specific subpart of the regulations is of particular concern. Many of the requirements set forth in that subpart seem clearly contrary to either prior Supreme Court precedent or our own cases. In particular, we note that section 205.730(a)(2) apparently requires the physician who is to perform the abortion to also perform a pregnancy test on the patient regardless of whether such testing had previously been done by another physician. We previously invalidated a similar "same doctor" requirement in an Illinois statute. See Charles I, 627 F.2d at 784, 786. The requirement in the instant regulation is, if anything, more burdensome and less justified than the one we invalidated there, which required only that the performing physician provide the patient with "a true copy" of her pregnancy test, rather than to

possibly conduct a second test. For the same reasons as in Charles I, the provision in this case is invalid.

The counseling requirements too suffer from constitutional defects. Section 205.730(b)(3) attempts to prescribe the precise content of such counseling in mandatory terms applicable to all cases. The regulation states that counseling "shall include a discussion of alternatives, description of the procedure to be performed, explanation of the risks and possible complications." We believe that this provision, particularly the requirement of a "discussion of alternatives" is unconstitutional under the Supreme Court's recent decision in Thornburgh v. American College of Obstetricians, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986). The requirement "that a specific body of information be given in all cases, irrespective of the particular needs of the patient, intrudes upon the discretion of the pregnant woman's physician and thereby imposes the 'undesired

11. We do not decide whether particular provisions of the regulations not specifically mentioned in the text would, standing alone, pass constitutional muster. In particular, the pathology examination required by the general regulations seems nearly identical to that upheld in Ashcroft. Also the reporting requirement does not appear particularly onerous, nor does it appear calculated to raise the fear of harassment by physicians and patients by raising the spectre of public disclosure. Section 205.760 of the regulations merely requires a report of each procedure performed in an ASTC within ten days, and that such reports be made in such a manner and at such time so as not to avoid accurate reporting of complications. If complications become known to the ASTC, it is required to submit a supplemental report. Section 205.620, a non-abortion-specific reporting requirement, merely requires reporting of the number and type of procedures performed, the number and type of complications reported, the number of patients requiring transfer to hospitals, the number of patients returning for follow-up, and the number of deaths. These requirements appear to be consistent with Planned Parenthood Association, Inc. v. Danforth, 428 U.S. 52, 79–81, 96 S.Ct. 2831, 2846–47, 49 L.Ed.2d 788 (1976). The requirements are considerably less stringent than those previously enjoined. In particular, the name of the patient is in no way required to be disclosed to the State.

Additionally, a number of the other general requirements seem as though they would place

no real burden at all on the abortion right. Requirements which may fall in this category might include the general provisions relating to personnel and administrative procedures governing ASTCs, such as those calling for a written policies and procedures manual, consulting committee, organization plan, personnel policies, and maintenance of a sanitary facility. Similarly, the operative care and post-operative care regulations may be in accord with accepted medical practice. Dr. Ragsdale objected to many of these requirements as "stating the obvious." However, so far as we are aware, there is no constitutional bar to "stating the obvious" even where abortion procedures are concerned.

Fewer of the abortion-specific regulations, as is evident from our discussion in the text, fall in this category. However, there was testimony below that the counselor qualification requirements of section 205.730(b)(2) were consistent with accepted medical practice. Additionally, subsection (1) of the same regulation merely requires, in general terms, that some counseling be given prior to the performance of an abortion (and that it occur in a room separate from the procedure room). As noted in the text infra, other aspects of the counseling requirements suffer from constitutional defects. Also, section 205.710 merely provides that "Abortions shall be provided to the public with the same standards of safety effectiveness, and regard for patients rights as any other health service."

Of course, we need not and do not decide the ultimate constitutionality of any of the requirements mentioned above.

and uncomfortable straitjacket' " which the Court has rejected. *Id.* 106 S.Ct. at 2179 (quoting *Planned Parenthood Association, Inc. v. Danforth,* 428 U.S. 52, 67 n. 8, 96 S.Ct. 2831, 2840 n. 8, 49 L.Ed.2d 788). The informational requirements of the regulation are certainly not as intrusive or as specific as those previously stricken by the Court, but they are just as inflexible. Dr. Ragsdale testified below that some of the information, particularly the "discussion of alternatives" might not be appropriate for some patients. We agree that "for a patient with a life-threatening pregnancy, the 'information' in its very rendition may be cruel as well as destructive of the physician-patient relationship." *Thornburgh,* 106 S.Ct. at 2180. We bear in mind that, during the second trimester at least, "the validity of an informed consent requirement ... rests on the State's interest in protecting the health of the pregnant woman." *Id.* at 2179 (quoting *Akron,* 462 U.S. at 443, 103 S.Ct. at 2499). Viewed in this light, the provision at issue here may, like that in *Thornburgh,* "require[ ] the dissemination of information that is not relevant to such consent, and thus, it advances no legitimate state interest." *Id.* at 2180.

■ Another aspect of the counseling requirements is troubling. Section 205.-730(b)(2)(D) requires that "counselors shall have no financial interest in the patient's decision." We find it impossible to read this provision in such a way that it does not, at least in some cases, preclude the performing physician from providing the counseling. This, we believe, is fundamentally at odds with the emphasis placed on the patient-physician relationship by *Roe* and its progeny. The woman desiring an abortion, according to those cases, is to reach that decision in consultation with "her responsible physician." *Roe,* 410 U.S. at 153, 93 S.Ct. at 727; *cf. Akron,* 462 U.S. at 449, 103 S.Ct. at 2502 (striking down a requirement that the attending physician, rather than other professionals, *must* provide the requisite counseling). The state cannot preclude that dialogue, or demand that others be a party to it merely because the physician has a "financial interest" in the woman's decision. In all other areas of

medicine, the state relies on the physician's professional and ethical obligations to prevent his "financial interest" from clouding his perspective to the detriment of his patient. It may not do otherwise merely because an abortion decision is involved. *See Doe v. Bolton,* 410 U.S. 179, 197–200, 93 S.Ct. 739, 750–51, 35 L.Ed.2d 201 (1973). In *Doe,* the Court struck down requirements that an abortion be approved by a hospital abortion committee and by two other physicians independent of the woman's own consulting physician because, *inter alia,* the state requiredsuch additional approval for "no other voluntary medical or surgical procedure...." According to the Court:

> If a physician is licensed by the State, he is recognized by the State as capable of exercising acceptable clinical judgment. If he fails in this, professional censure and deprivation of his license are available remedies. Required acquiescence by co-practitioners has no rational connection with a patient's needs and unduly infringes on the physician's right to practice.

*Id.* at 199, 93 S.Ct. at 751.

We believe those principles are equally applicable here. Accordingly, we hold that the requirement that counseling be conducted by one who has no "financial interest" in the patient's decision is unconstitutional.

### D.

■ Of the requirements applicable to ASTCs generally, the physical plant equipment and staffing requirements, in particular, seem totally unjustified from a medical standpoint. The testimony regarding many of the physical plant requirements makes clear that they have "no medical justification whatsoever" when applied to first and early second trimester abortions of the type involved in this case.

According to the testimony, the minimum size requirements for examination rooms, procedure rooms, recovery rooms, and corridors and doors not only are not "medically necessary," but do not enhance the safe-

ty of the abortion procedure "in any way" and do not have "any medical justification." R.Vol. I at 263–72 (testimony of Dr. Hern); *see also* R.Vol. I. at 154 (testimony of Dr. Ragsdale) (large procedure room "not only medically unnecessary but medically poor"). We agree that the requirements that ASTCs performing first and early second trimester abortion(s) be "the functional equivalent of small hospitals" are not sufficiently justified by "important state health objectives" to be sustained.

Additionally, the ventilation requirements of the regulations, which require specific air pressure relationships between rooms and specific air change ratios are unrelated to the safety of first and early second trimester abortions. The purpose of such requirements is to prevent infection from airborne bacteria. All of the medical experts, including defendants', testified that airborne bacteria simply is not relevant to the procedures involved in this case, because the procedures do not involve an incision. The sole testimony to the effect that such requirements might be advisable came from the State's architectural expert, who apparently believed that an incision was required. It can scarcely be doubted that such a witness lacks any expertise to enable him to form an opinion regarding the medical justification for a particular requirement.[12]

More importantly, perhaps, the defendants failed to adduce any evidence at all of a medical justification for the physical plant requirements. Although the defendants protest on appeal that plaintiffs' experts who testified as to the lack of medical justification were not building and construction experts, the relevant test is whether the standards are "justified by important state health objectives." It seems clear to us that medical experts can offer testimony relevant to that standard, and it is questionable whether those without a health care background can. As we have noted above, only defendants' archi-

tectural expert testified as to the need for the ventilation requirements. This witness similarly testified regarding room sizes, although he stated that the requirements were drafted with procedures involving general anesthesia in mind. At one point, he testified that he relies on the physician operating a facility to determine what is medically required. Linder Dept. at 42.

The structural, equipment, and staffing requirements of the regulations are quite similar to those invalidated in *Reizen. See* 743 F.2d at 364–65. They also bear a remarkable resemblance to the abortion-specific scheme we invalidated in *Friendship.* While the evidence in *Reizen* indicated a per-patient cost increase considerably greater than that in this case (*Friendship* did not consider particularized cost estimates), the regulations there, as here, would have required considerable up-front expenditures. Also, as we have noted above, per-patient financial cost is not the only relevant burden. We have little trouble concluding that these requirements, which impose a substantial burden and are not justified by health objectives, are unconstitutional.

### E.

■ We also believe that the "certificate of need" proceeding requirement of the Health Facilities Planning Act is unconstitutional. The only interest which the State has articulated is the desire to keep costs down under the "cost-plus" disbursement method which was at one time used by the State in making certain health care payments for its residents. Apart from the fact that this interest no longer exists because the State has discontinued use of this method, the State has never made such payments for abortions. Furthermore, the interest cannot be said to be compelling in any event. While a state may have some interest in preventing wasteful duplication of resources, the interest must give way

---

12. Defendants' medical expert, Dr. Barton, lacked significant experience performing first trimester abortions. Those which he did perform were generally performed under a general anesthetic in a hospital setting. Due to his lack

of experience relevant to the procedures at issue in this case, the district court properly accorded his testimony little weight. Defendants similarly do not rely on it heavily in this court.

where the exercise of constitutional rights is concerned. Certainly it would be unconstitutional for a state to require that anyone desiring to publish a newspaper demonstrate "need" for the publication, though it can scarcely be gainsaid that at least some few involve wasteful duplication. Where the exercise of constitutional rights is concerned, the government may play no role in determining whether outlets for their exercise are "needed."

The unconstitutionality of the "certificate of need" proceedings as applied to ASTCs that wish to perform abortions is exacerbated by the failure of the State to prevent the process from becoming essentially a public veto of the ASTCs' existence. As we noted above, the proceedings attended by the individual plaintiff physician was allowed to degenerate into a shouting match between abortion foes and advocates of free choice. The State's unwillingness or inability to confine the proceedings to its even arguably legitimate goals bolsters our conclusion that this requirement cannot stand because it is not justified by any legitimate State interest.

## V

■ While, as we have noted above, there may well be facets of the statute and regulations which would individually pass constitutional muster, *supra* nn. 8 & 11, we are constrained to affirm the district court's injunction of the scheme as a whole. Defendants, citing *Zbaraz v. Haritgan*, 763 F.2d 1532, 1545 (7th Cir.1985), aff'd, —— U.S. ——, 108 S.Ct. 479, 98 L.Ed.2d 478 (1987) and *Charles I*, 627 F.2d at 779, urge that we specifically analyze each provision and sever those portions which are unconstitutional. However, in neither *Zbaraz* nor *Charles I* were we confronted with a comprehensive scheme which either applied or not depending on whether a licensing requirement could stand. In *Zbaraz*, we noted that severability applies only to "any provisions which can be given effect without the invalid provisions," and that "severance is improper if the unconstitutional provision is 'an integral part of the statutory enactment viewed in its entirety.'" 763 F.2d at

1545 (quoting *Scheinberg v. Smith*, 659 F.2d 476, 481 (5th Cir.1981)). Here, where we are dealing with a licensing scheme and the provision for separate licensure is itself invalid, not only can none of the other provisions "be given effect without the invalid provisions," but the licensing provision is certainly "an integral part" of the scheme as a whole. Additionally, in neither *Zbaraz* nor *Charles I* was the scheme already so riddled with exceptions resulting from judicial decisions and non-enforcement policies as to be unintelligible. In such circumstances, we simply "cannot untangle the constitutional from the unconstitutional provisions...." *Mahoning Women's Center v. Hunter*, 610 F.2d 456, 460 (6th Cir.1979), *vacated on other grounds*, 447 U.S. 918, 100 S.Ct. 3006, 65 L.Ed.2d 1110 (1980).

As originally written, the statute and regulations represented at least a coherent, if unconstitutional, whole which regulated all aspects of abortion practice in Illinois. However, as a result of various judicial decisions, and the defendants' change of enforcement policies in response to them, the scheme has long since lost that coherence. The statute and regulations as written bear very little resemblance to the way they are currently enforced. As is clear from portions of our opinion, we have at times encountered considerable difficulty discerning just what the law in Illinois is. Yet, the State expects physicians, on pain of professional censure (possibly including loss of their licenses) and a $10,000 a day fine, to divine the contours of the rules under which they must operate.

Under these circumstances, we fully agree with the Sixth Circuit's decision in *Mahoning Women's Center*. There, in invalidating, in its entirety, a local ordinance that required "the functional equivalent of a hospital" for first trimester abortions, the court held "[i]n this situation, we do not believe a useful purpose would be served by attempting to rewrite the minor provisions of the ordinance in order to make them constitutional." 610 F.2d at 461. We could not agree more.

Accordingly with the exception of the portion of the injunction regarding the second trimester hospitalization requirement, which is VACATED AS MOOT, the preliminary injunction is

AFFIRMED.

COFFEY, Circuit Judge, dissenting.

A decade and one-half ago the Supreme Court announced "that the right of personal privacy includes the abortion decision, but that this right is not unqualified and must be considered against important state interests in regulation." *Roe v. Wade*, 410 U.S. 113, 154, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973). Today, under the guise of protecting the woman's constitutional privacy rights, the majority holds that the State of Illinois' health services statutory scheme, enacted in an attempt to regulate the ever-escalating costs of medical care without sacrificing its citizens' health and safety, is unconstitutional. Specifically, now some 14 years after its enactment, the majority declares the Ambulatory Surgical Treatment Center Act, 111½ Ill.Rev.Stat. ¶¶ 157–8.1 *et seq.* (the "ASTCA" or the "ASTC Act") and the regulations promulgated thereunder unconstitutional, holding that the State may not require licensure of facilities devoted primarily to performing semi-complicated (minor) surgery, including first-trimester abortions. As an alternative approach, the majority chooses and carves out a select few ASTC regulations among various others, discusses their validity, and then proceeds to invalidate those regulatory sections of the ASTC Act that apply to first-trimester abortion facilities in Illinois, stating that it was unable to sever those

provisions of the Act it deemed unconstitutional from those that were constitutional. Thus, the majority strikes down the ASTCA and baldly asserts that "the [statutory] scheme has long since lost ... coherence." Unfortunately, it is the majority's decision, rather than the Illinois legislative scheme, that lacks coherence.[1] I am convinced that under *Roe* and its progeny that the individual states have the authority to ensure that all surgical procedures, including first-trimester abortions, are performed "under conditions insuring maximum safety for the woman." *Connecticut v. Menillo*, 423 U.S. 9, 11, 96 S.Ct. 170, 171, 46 L.Ed.2d 152 (1975) (per curiam). Certainly states have the power and authority, if not the duty, to apply the same licensing standards to abortion facilities as those applied to facilities performing similar surgical procedures.[2] I know of no law to the contrary.

Moreover, the majority decision ignores the legislative intent and the historical context of the enactment of the challenged provisions: section 16(1) of the Medical Practice Act (the "MPA"), 111 Ill.Rev.Stat. ¶ 4433(1); the Ambulatory Surgical Treatment Center Act, 111½ Ill.Rev.Stat. ¶¶ 157–8.1, *et seq.*, and the regulations promulgated thereunder; and the Illinois Health Facilities Planning Act, 111½ Ill.Rev.Stat. ¶¶ 1151, *et seq.*, particularly ¶¶ 1155–1160. Research reveals that the Illinois legislature enacted § 16(1) of the MPA[3] intending to limit the performance of abortions only to licensed ambulatory surgical treatment centers, hospitals, or similar facilities and expressed such intention by requiring licensure of "any facility in which a medical or surgical procedure is utilized to terminate a

---

1. The majority's precise holding is confusing. On the one hand, the majority affirms the district court's preliminary injunction which only enjoined Illinois from regulating ASTCs to the extent those facilities were performing abortions. On the other hand, the majority apparently strikes down not only § 16(1) of the MPA, but the ASTCA and the IHFPA as well, stating it could not "untangle the constitutional from the unconstitutional," and further asserts that specific substantive aspects of the statutes and regulations are unconstitutional and "render the scheme unconstitutional as a whole."

2. As demonstrated, *infra*, the most significant undisputed fact in the record is that an abortion, regardless of the trimester in which it is performed, is considered a surgical procedure, albeit a minor surgical procedure, accompanied all too frequently by concomitant medical, physical, and psychological complications.

3. As noted by the majority, § 16(1) of the MPA "allows for revocation or suspension of the license of any physician *who performs an 'elective abortion' in any place other* than a licensed Ambulatory Surgical Treatment Center (ASTC), a hospital, or a facility run by the state or federal governments." (Emphasis added.)

pregnancy, irrespective of whether the facility is devoted primarily to this purpose," (definitions section—ASTCA, ¶ 157–8.3(A)).[4] However, the legislature's primary purpose for enacting the *Ambulatory Surgical Treatment Center Act* was to regulate and prescribe safeguards for the rapidly developing trend of cost-effective ambulatory surgical medical services. The majority unfortunately disregards this primary purpose which provided the impetus for the enactment of the ASTCA and through mere speculation holds that the ASTCA is solely an abortion statute. Further, in its determination to do away with the duly enacted legislation, the majority completely disregards the statute's severability clauses as if they didn't exist, stating it could not "untangle the constitutional from the unconstitutional" and thus refuses to give effect to the challenged acts.[5] Rather than recognize and effectuate the true intent and legitimate purpose of the acts and enjoin only those provisions which might impinge on a woman's limited right to terminate her pregnancy (§ 16(1) of the MPA, its companion clause in ¶ 157–8.3(A) and § 205.730(b)(2)(D) of the ASTCA regulations), the majority, in over-expansive language, declares, " '[W]e do not believe a useful purpose would be served by attempting to rewrite minor provisions of the ordinance [in this case the statutes and regulations] in order to make them constitutional.' " In so holding, the majority improperly substitutes its judgment for that of the legislature which enacted the statute because of its concern for the safety of its citizens. In the end, the majority decision severely limits (or casts aside) the state's ability to implement cost-effective schemes and regulate rapidly developing and modern methods of providing medical services simply because abortion (surgical) procedures may be involved. The majority's misdirected holding ultimately protects only the financial interests of abortion providers, like Dr. Ragsdale, rather than following the Supreme Court's limited mandate in *Roe* aimed at protecting the patient's privacy rights. If we allow the majority's "reasoning" to stand, surgeons, as well as other ASTC operators whose facilities are devoted primarily to the performance of abortions, will be allowed to operate without regulation while those ASTCs primarily performing other types of minor surgical procedures will remain regulated (assuming the majority's decision merely affirms the district court's preliminary injunction). Thus having treated facilities devoted *primarily* to abortions differently from those facilities *primarily* devoted to other surgical procedures, the majority carves out an "abortionist exception" to the general rule that states can reasonably regulate how medical services are provided to its citizens. Ultimately, the majority in effect creates a legal vehicle for the non-abortionists primarily performing other surgical procedures to challenge the ASTCA on equal protection grounds; for what rational basis exists for regulating ambulatory surgical centers differently than those facilities, like Ragsdale's abortion enterprise, devoted primarily to the termination of pregnancies?

The task of a reviewing court, contrary to the majority's reasoning, is, "of course, ... to resolve the issue by constitutional measurement, free of emotion and predilection." *Roe v. Wade*, 410 U.S. at 116, 93 S.Ct. at 709. Consistent with this Supreme Court directive, our decision must neither reflect pro choice nor anti-abortion sentiment. The Illinois legislation at issue, spe-

4. ¶ 157–8.3 provides:

"(A) 'Ambulatory surgical treatment center' means any institution, place or building devoted primarily to the maintenance and operation of facilities for the performance of surgical procedures *or any facility in which a medical or surgical procedure is utilized to terminate a pregnancy, irrespective of whether the facility is devoted primarily to this purpose.* Such facility shall not provide beds or other accommodations for the overnight stay of patients. Individual patients shall be discharged in an ambulatory condition without danger to the continued well being of the patients or shall be transferred to a hospital." (Emphasis added to highlight the clause included in the ASTCA restricting the availability of an abortion.)

5. The severability clauses of the MPA, ASTCA, and the IHFPA are found respectively at 111 Ill.Rev.Stat. ¶ 4458, 111½ Ill.Rev.Stat. ¶ 157–8.15, and 111½ Ill.Rev.Stat. ¶ 1166.

cifically the ASTCA, is fundamentally different from other Illinois abortion-related legislation and merits thorough, reflective, and separate consideration. I would enjoin § 16(1) of the MPA and sever and further enjoin its companion clause in ¶ 157–8.3(A) of the ASTCA requiring licensure of "any facility in which a medical or surgical procedure is utilized to terminate a pregnancy, irrespective of whether the facility is devoted primarily to this purpose" because these provisions prevent a physician from performing a first-trimester abortion in his or her office. Under *Roe* and its progeny this prohibition may very well be considered unconstitutional. I am convinced that the states, including Illinois, are free to regulate ambulatory surgical treatment centers, including those performing abortions, as long as abortions are not singled out from other, similar surgical procedures, subject only to the well-known rational basis test governing social and economic legislation. Under the rational basis test the ASTCA and IHFPA are constitutional. Consistent with this analysis, I further evaluate the remaining abortion-specific statute sections and regulations [6] promulgated thereunder under the strict scrutiny test articulated in *Roe* and its progeny [7] and would hold all but one of these constitutional because these statutory sections and regulations neither burden the abortion decision nor its effectuation, and are justified with important health objectives in mind.

When the alleged "tripartite" legislative scheme is thus analyzed, neither a woman's right to terminate her pregnancy, nor the state's right to rationally regulate modern medical services for the protection of its citizens is adversely affected. Thus, I would reverse the district court's order enjoining Illinois' health services laws, except to the extent it enjoined § 16(1) of the Medical Practice Act, its companion clause in ¶ 157–8.3(A) of the ASTCA, and § 205.730(b)(2)(D) of the ASTCA regulations.

I

The majority decision properly notes that the "statutory and regulatory scheme is somewhat complex," but then proceeds to further confuse the challenged acts and their interrelationships, completely disregarding the legislature's intent regarding the various acts. The record of the legislative history reveals that § 16(1) of the MPA, 111 Ill.Rev.Stat. § 4433(1), and the Ambulatory Surgical Treatment Center Act (ASTCA), 111½ Ill.Rev.Stat. ¶¶ 157–8.1, *et seq.*, were initially companion bills to the initial comprehensive Illinois Abortion Act (IAA), 38 Ill.Rev.Stat. ¶¶ 81–11, *et seq.*[8] The IAA, § 16(1) of the MPA, and the ASTCA, were Senate Bills (S.B.) 1049, 1050, and 1051, respectively. The legislative history further reveals that S.B. 1049 and S.B. 1050 were integrally related; their purpose was to regulate abortions in Illinois in light of, and in an attempt to comply with, the Supreme Court's then-recent *Roe* and *Doe* decisions. As noted by the majority, § 16(1) of the MPA provided for the

---

6. For example, ¶ 157–8.6–1 of the ASTCA requires that any corporation operating an ASTC "devoted primarily to providing facilities for abortion" must have a licensed physician who is "actively engaged in the practice of medicine at the Center, on the board of directors as a condition of licensure." Additionally, subpart G of Title 77 of the Illinois Administrative Code contains abortion-specific regulations. The validity of all but one of these provisions is demonstrated, *infra.*

7. I concur with the majority that the challenge to the second-trimester hospitalization requirement is moot. It appears that the majority effortlessly utilized and applied the severability clause of the Act to the second-trimester hospital requirement, but lost this analytical ability with respect to the other challenged provisions.

8. The initial Illinois Abortion Law, ¶¶ 81–11, *et seq.*, became effective July 19, 1973, but was subsequently repealed by the Abortion Law of 1975, effective October 30, 1979. The Abortion Law of 1975 has been challenged on more than one occasion. *See, e.g., Charles v. Carey,* 579 F.Supp. 464 (N.D.Ill.1983), *aff'd in part, rev'd in part on other grounds, Charles v. Daley,* 749 F.2d 452 (7th Cir.1984), *appeal dismissed sub nom. Diamond v. Charles,* 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). The initial IAA had a completely different purpose than the ASTCA and IHFPA. However, the majority confuses the purposes of the IAA from that of the ASTCA and IHFPA, and in doing so clouds its ability to analyze the challenged statutes and regulations.

"revocation or suspension of the license of any physician who performs 'elective abortions' in any place other than a licensed Ambulatory Surgical Treatment Center (ASTC), a hospital, or a facility run by the state or federal governments." Apparently, members of the Illinois legislature were concerned that the State would eventually be responsible for the cost of abortions performed on indigents in hospitals, so to reduce the State's anticipated abortion costs, less-expensive ASTC facilities were included in the list of approved locations for the performance of pregnancy termination procedures. At the same time the legislature was debating the regulation of abortions, ASTCs were just coming into existence and thus not regulated. Thus, S.B. 1051, an independent health regulatory bill creating and regulating ASTCs, was made a companion bill to the abortion bills.

Contrary to the majority's assertions, the ASTCA, unlike the IAA and § 16(1) of the MPA, was not primarily enacted for the purpose of regulating abortions. The record and legislative history reveal that the ASTC Act became law in Illinois in 1973 with the express policy of insuring maximum safety in all medical procedures, providing:

> "for the better protection of the public health through the development, establishment, and enforcement of standards (1) for the care of individuals in ambulatory surgical treatment centers, and (2) for the construction, maintenance and operation of ambulatory surgical treatment centers, which, in light of advancing

knowledge, will promote safe and adequate treatment of such individuals in ambulatory surgical treatment centers."

Ill.Rev.Stat. ch. 111½, ¶ 157–8.2. Further, the ASTCA was intended to regulate the cost-effective and rapidly developing ambulatory outpatient surgical medical services. The minutes of the March 7, 1974, Ambulatory Surgical Treatment Center Licensing Board meeting provide relevant historical facts relating to the enactment of the ASTCA:[9]

> "In July 1971 ... a member of the hospital licensing board, was appointed chairman of a committee appointed to formulate regulations for those facilities that were presently unlicensable. Consideration was given to a large number of classifications and actually there were 32 types of health facilities listed.... On July 12, 1972, the final draft (after four drafts) of proposed standards were submitted to the Hospital Licensing Board.... [O]n August 16 [a member of the Board] sent these proposed regulations forward [to the legislation liaison].... About August 1972 [the Board] began to get involved more with the question of abortions which became the primary target for discussion."

The significance of these Board minutes lies in the fact that as early as 1971 a state agency began preparing the proposed regulations in response to the changing needs and practices of medical services. Cost-effective "[f]ree-standing ambulatory surgical centers (FASCs) are independent entities which first opened in 1970....

---

9. The majority improperly relies on the ASTC Licensing Board minutes for the legislative intent of the act. The March 7, 1974, minutes conclude that "the legislation was written specifically for regulation of the performance of abortions." On this basis, the majority states, "First, we cannot ignore the fact that the ASTCA was enacted primarily with abortion clinics in mind and only applied to outpatient surgical clinics generally in an effort to save the statute from unconstitutionality." Initially *I point out that the district court specifically and properly rejected the plaintiff's request to admit the minutes of the licensing board meeting as proof of the legislature's intent.* Tr. at 616. The district court's evidentiary ruling was proper because "a court should adhere to the enacting legislature's pur-

poses," Posner, *The Federal Courts,* p. 279 (1985), rather than post-enactment statements regarding legislative intent, particularly when those statements are not even made by the legislators involved. The district court received the licensing board minutes only for the limited purpose of establishing the Board's state of mind regarding its enforcement procedures. However, the historical facts regarding the development of the ASTC legislation and regulations are reliable, material, and relevant to understanding the historical context in which the ASTCA was enacted. Thus, I make limited reference to the minutes of the Board meeting only to draw attention to the historical facts contained therein.

[T]hese facilities were conceived to fill a gap between the doctor's office and the hospital for minor surgical procedures not requiring overnight hospitalization." Note, *Freestanding Emergency Centers: Regulation and Reimbursement*, 11 Am.J.L. & Med. 105, 118 (1985).[10] "The first successful freestanding ambulatory surgery center (FASC), [well known as Surgicenter], was opened in February 1970 in Phoenix, Arizona." D. Ermann and J. Gabel, *The Changing Face of American Health Care, Multi–Hospital System, Emergency Centers, and Surgery Centers*, 23 Medical Care 401, 406 (May 1985). As early as 1976 one commentator observed:

> "From a societal point of view, perhaps the greatest impetus behind the ambulatory surgery concept is its potential for reducing the cost of services. This potential applies to both freestanding and hospital-based facilities, the two major prototypes for ambulatory surgery. By eliminating overnight hospital stays, expenditures for hospital services for inpatient health care, which now account for about 40 percent of our total national health expenditure, may be reduced directly and dramatically, at least on a short-term basis. By focusing on reducing inpatient surgery (accounting for 60 percent of all hospital expenditures and about 25 percent of total health care expenditures), ambulatory surgery may further reduce costs."

T. O'Donovan, *Ambulatory Surgical Centers, Development and Management*, p. 143 (1976). Further, by 1984 the ASTC trend was well established:

> "The success of the Phoenix center precipitated rapid growth of a new type of facility for the delivery of ambulatory surgery, the freestanding, independent, ambulatory surgery center. Since that time, the Surgicenter has become a model for an increasing number of both independent and hospital-sponsored freestanding ambulatory surgery programs. According to the Freestanding Ambulatory Surgical Association (FASA), there are approximately 125 independent freestanding ambulatory surgery centers, 86 of which are members of FASA. According to FASA, which has been keeping statistics on its members since 1974, the membership performed 94,499 ambulatory surgery procedures in 1981, an increase of 6 percent over the number performed in 1980. This figure can be compared to 3.2 million ambulatory surgical procedures performed by hospitals offering ambulatory surgery in 1980."

L. Burns, *Ambulatory Surgery, Developing and Managing Successful Programs*, pp. 11–12 (1984). Lastly, I observe that freestanding ambulatory surgical centers are properly subject to licensure and regulation (as are the vast majority of medical facilities performing surgeries) throughout the country, and not only in Illinois. One writer pointed out that:

> "a FASC must obtain a state CON [Certificate of Need] in order to build the facility. In some states FASCs must also seek accreditation. In Illinois, FASCs are licensed and regulated by the State Department of Public Health. In Minnesota, surgical centers are covered by licensing rules. They must be staffed and equipped to handle surgical procedures, anesthesia, and post-surgical care."

Note, *Freestanding Emergency Centers, Regulation and Reimbursement*, 11 Am.J. L. & Med. 105, 118 (1985).

Obviously the Illinois Legislature was not privy to all this information regarding ambulatory surgical treatment centers in 1973, at the time it enacted the ASTCA. However, as I stated, the record and legislative history reveal that the legislature was well aware of the new and fast devel-

---

**10.** Much has been written regarding trends in ambulatory medical services, including ambulatory surgical treatment centers. *See generally* T. O'Donovan, *Ambulatory Surgical Centers, Development and Management* (1976); L. Burns, *Ambulatory Surgery, Developing and Managing Successful Programs* (1984); M. Roemer, *Ambulatory Health Services in America* (1981); D. Ermann and J. Gabel, *The Changing Face of American Health Care*, 23 Medical Care 401 (May 1985); Pavarini, *Setting Up and Operating Ambulatory Care Centers in a Competitive Environment*, 29 St. Louis U.L.J. 747 (1985).

oping medical trend in outpatient ambulatory care and specifically sought to regulate it. During the Senate debates, state Senator Wooten summarized S.B. 1051 as follows:

"This is another one of those bills that cuts across lines in all kinds of ways. The Illinois State Medical Society asked that it be presented in a series with the two previous bills [S.B. 1049 and S.B. 1050], one changing the law relating to abortion, the other changing the Medical Practices Act. *While this has a relationship to abortion, it actually goes much beyond that. It [S.B. 1051] provides for the establishment and licensing of facilities which can perform minor surgery.* This would be things like tonsilectomy, hernias, abortions would be included, facial surgery, plastic surgery and so on. In other words procedures which would not require an overnight stay. And indeed these ambulatory surgical treatment centers are forbidden to keep patients overnight. However, those of you who have kept close to medical practices know that untoward things can occur at any time, and so provision is made in here that *doctors who function in such a center must also be licensed to practice in a hospital nearby so that if any complications occur they can quickly move the patient to that place.* Now, I handed out an outline to explain to you how these things would work, definitions, they must get a license, some of these things are left open as to regulations. The Department would like to take a hand in that. *This is something doctors have been urging us to do for a couple of years now, and ambulatory surgical treatment centers are ... in effect out west. The idea is that they can be a great saving to a patient.* One of the big costs in a hospital, if you remember it's kind of like a hotel which has special services and if you don't need that overnight stay, you can save a great deal of money. So there's a great savings possible for the patient who needs this kind of one-day surgical treatment. *It does include abortion, and every-*

*thing would be rather closely regulated and inspected."*

(Emphasis added). Another state senator further pointed out that:

"This bill is a good bill. It's not related in any way to abortions. It's sponsored by the Medical Association. There's nothing wrong with ambulatory medical services."

Thus, contrary to the majority's mere speculative assertions, the legislative history clearly and unequivocally supports the proposition that the ASTCA was not enacted primarily to regulate abortions, but rather for the regulation of all semi-complicated (minor) surgical procedures performed in the rapidly developing ambulatory surgical treatment centers. Finally, I observe that just prior to the ASTCA's enactment, Senator Wooten specifically stated: "The *main thrust of [S.B. 1051] is to try to save some money by getting minor surgical treatment out of the hospital where it is hideously expensive and into a clinic."* (Emphasis added).

The record and the legislative history further reveal that the Illinois Health Facilities Planning Act (IHFPA) was enacted one year after the enactment of § 16(1) of the MPA and the ASTCA and was clearly not part of a "tripartite" legislative scheme to limit the availability of abortions. The legislative history of the IHFPA reveals that it neither mentions abortions, nor referred to them, nor was it enacted for purposes of regulating abortions. The IHFPA was intended to address the problem of expensive, overexpanded and underpopulated medical facilities and underutilized medical equipment in the State of Illinois. In the words of a legislator, the IHFPA was to

"provide a means *for proper planning with local input and decision making to cut down on empty hospital facilities,* nursing home facilities, sheltered care ... facilities and ... *ambulatory surgical facilities."*

(Emphasis added).

Thus, the legislative history of the acts supports the valid premise that the legislature intended to regulate abortions when it

enacted the Illinois Abortion Act. It also appears that section 16(1) of the MPA and its companion clause in ¶ 157–8.3(A) of the ASTC were probably enacted to prevent abortions from being performed in a physician's office. On the contrary, there is no proof in this record that either the ASTCA or the IHFPA were enacted primarily to regulate abortions; rather, these laws were adopted to regulate the delivery of medical services to its citizens and to attempt to prevent and control the further unnecessary overexpansion of Illinois' medical facilities. That the ASTCA was initially a companion bill to the abortion bills is more of a historical coincidence relished by political opportunists who, in this case, apparently fully utilized it to their advantage. As the minutes of the licensing board reflect, for whatever their worth: "Without the public interest in abortions, we would not have any of the present legislation." That is to say that the state legislators and other interested parties who were primarily interested in regulating ambulatory medical services would not have been able to enact the legislation without the statewide and even nationwide interest in the abortion question at the time.

The majority, acting and reasoning as if living in a social and economic vacuum (overlooking the developing nationwide trend of ASTCs), ignores the dual purpose of the legislative scheme presently at issue, selectively carving out the regulatory motive of the ASTCA to support its abortion theory of enactment. Thus, the majority states: "As originally written, the statute [I assume the ASTCA] and regulations represented at least a coherent, if unconstitutional, whole which regulated all aspects of abortion practice in Illinois." Having ignored or at least overlooked the State's legitimate intent to regulate the new and rapidly developing trend of ambulatory surgical medical services, the majority treats the ASTCA and the regulations promulgated thereunder as "minor" abortion provisions. Further, the majority rejects the basic principle of severability when interpreting the construction of a duly adopted legislative enactment which should give effect to the State's legitimate purposes; and

thus fails to apply the correct legal standard to the different acts and regulations and affirms the preliminary injunction. Thus, the majority limits and fails to effectuate the legitimate legislative purposes behind the ASTCA. As a noted commentator has observed, limiting the scope of a legislature's intent constitutes undesirable judicial activism as much as a decision construing a statute beyond its intended scope. *See* Posner, *Statutory Interpretation, in the Classroom and in the Courtroom,* 50 U.Chi.L.Rev. 800, 822 (1983). The majority's failure to give full effect to the real and legitimate legislative intent to regulate ASTCs is the basis of my dissent.

Recently, this court observed:
"In *Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), the Supreme Court stated that unconstitutional provisions in a statute shall be severed if it appears that the legislature would have enacted constitutional provisions of the statute independently of those provisions. 103 S.Ct. at 2774 (citing *Buckley v. Valeo,* 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976))."
*Zbaraz v. Hartigan,* 763 F.2d 1532, 1545 (7th Cir.1985), *aff'd,* — U.S. —, 108 S.Ct. 479, 98 L.Ed.2d 478 (1987). The Illinois laws in question all have their own severability provisions; thus, it is clear that the Illinois legislature intended that the constitutional provisions of the acts should be given effect even if other provisions were held unconstitutional. Accordingly, I analyze the challenged statutes and regulations recognizing that "severance is improper [only] if the unconstitutional provision is 'an integral part of the statutory enactment viewed in its entirety.'" *Id.* (quoting *Scheinberg v. Smith,* 659 F.2d 476, 481 (5th Cir.1981)). On the other hand, the challenged provision which burden a woman's right to privacy may be severed as long as the severed provisions do not affect "the essential purposes of the act." *Id.*

## II

The abortionist, Dr. Richard M. Ragsdale, plaintiff-appellee, testified at the pre-

liminary injunction hearing that the alleged "[f]irst and major burden [affecting a woman's right to terminate her pregnancy] is simply the requirement for an independent licensure as an abortion provider." This licensing requirement, applicable to any physician who wishes to perform an abortion outside of a hospital, an ASTC, or other regulated facility, regardless of the gestational period of the embryo or fetus, was created when the legislature enacted § 16(1) of the MPA and its companion clause in the ASTC definitions section. As previously noted by the majority, "[s]ection 16(1) of the Medical Practice Act ... allows for revocation or suspension of the license of any physician who performs an 'elective abortion' in any place other than a licensed Ambulatory Surgical Treatment Center ..., a hospital, or a facility run by the state or federal governments." The following clause in ¶ 157–8.3(A) of the ASTCA is the companion clause to § 16(1) of the MPA, and brought all surgeons who wished to perform abortions under the ASTCA licensing and regulatory scheme:

> "'Ambulatory Surgical Treatment Center' means ... any facility in which a medical or surgical procedure is utilized to terminate a pregnancy, irrespective of whether the facility is devoted primarily to this purpose...."

Significantly, the defendant-appellant, the State of Illinois, asserts that it no longer enforces § 16(1) of the MPA. Additionally, the majority observes that Illinois alleges that the clause in ¶ 157–8.3(A) above is no longer being enforced, noting that:

> "Since 1981, the [ASTC] act and regulations have been applied only to facilities which are primarily devoted to the performance of surgical procedures (including abortions). This enforcement policy was adopted in response to *Village of Oak Lawn v. Marcowitz*, 86 Ill.2d 406 [55 Ill.Dec. 916], 427 N.E.2d 36 (1981), which refused to enforce, in a criminal proceeding, that portion of the local ordinance which incorporated the ASTCA definition of an ASTC which covered 'any facility where a medical or surgical procedure is performed for the termination of pregnancy, regardless of whether the

facility is primarily devoted to that purpose.' "

The majority holds, and I agree, that Illinois' alleged nonenforcement policy does not render the issues moot.

Although several justices have persuasively argued that *Roe v. Wade* and its progeny articulate an "unworkable scheme for constitutionalizing the regulation of abortion." *Thornburgh v. American College of Obstetricians*, 476 U.S. 747, 814, 106 S.Ct. 2169, 2207, 90 L.Ed.2d 779 (1986) (Justice O'Connor, dissenting), or represent a "venture ... fundamentally misguided since its inception," *Id.* at 786, 106 S.Ct. at 2192 (Justice White, dissenting), this court should be bound by *Roe* and its progeny. The Supreme Court's recent *Thornburgh* decision "reaffirm[ed] the principles laid down in *Roe* and *Akron*." *Id.* at 759, 106 S.Ct. at 2178. Thus, we analyze the abortion licensing requirement created when the Illinois legislature enacted § 16(1) of the MPA and its companion provision contained in the ASTC definition of ambulatory surgical treatment center, ¶ 157–8.3(A), under the standards articulated in *Roe* and its progeny.

> "In *Roe v. Wade*, the Court held that the 'right of privacy, ... founded in the the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, ... is broad enough to encompass a woman's decision whether or not to terminate her pregnancy.' ...

> \* \* \* \* \* \*

> The Court also has recognized, because abortion is a medical procedure, that the full vindication of the woman's fundamental right necessarily requires that her physician be given 'the room he needs to make his best medical judgment.' ...

> At the same time, the Court in *Roe* acknowledged that the woman's fundamental right *'is not unqualified and must be considered against important state interests in abortion.'* ... But restrictive state regulation of the right to choose abortion, as with other fundamen-

tal rights subject to searching judicial examination, must be supported by a compelling state interest.... [The Supreme Court] recognized two such interests that may justify state regulation of abortions.

First, a state has an 'important and legitimate interest in protecting the potentiality of human life.' ... Although this interest exists 'throughout the course of the woman's pregnancy,' ... it becomes compelling only at viability, the point at which the fetus 'has the capability of meaningful life outside the mother's womb.' ...

Second, because a State has a legitimate concern with the health of women who undergo abortions, 'a State may properly assert important interests in safeguarding health [and] in maintaining medical standards.' ... [The Court further] held in Roe, however, that this health interest does not become compelling until 'approximately the end of the first trimester' of pregnancy.... Until that time, a pregnant woman must be permitted, in consultation with her physician, to decide to have an abortion and to effectuate that decision 'free of interference by the State.'

This does not mean that a State never may enact a regulation touching on the woman's abortion right during the first weeks of pregnancy. Certain regulations that have no significant impact on the woman's exercise of her right may be permissible where justified by important state health objectives....

From approximately the end of the first trimester of pregnancy, the State 'may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health.' ... The State's discretion to regulate on this basis does not, however, permit it to adopt abortion regulations that depart from accepted medical practice. [The Court has] rejected a State's attempt to ban a particular second trimester abortion procedure, where the ban would have increased the cost and limited the availability of abortions without promoting important health benefits.... If a State requires licensing or undertakes to regulate the performance of abortions during this period, the health standards adopted must be 'legitimately related to the objective the state seeks to accomplish.' "

City of Akron v. Akron Center for Reproductive Health, 462 U.S. 416, 426–31, 103 S.Ct. 2481, 2490–93, 76 L.Ed.2d 687 (1983) (citations omitted) (emphasis added).

Initially one observes that the abortion licensing requirement as it exists pursuant to § 16(1) of the MPA and the ASTCA definition, fails to distinguish between first and second trimester abortions; thus, it prohibits the performance of first-trimester abortions in physicians' offices. The record reveals that a woman's qualified right under Roe to terminate her pregnancy is very probably impermissibly burdened because surgeons who would otherwise perform first-trimester abortions out of their offices are precluded from doing so. Dr. Ragsdale, an abortionist and a board-certified obstetrician and gynecologist, testified that outpatient abortions, whether performed in a physician's office or a clinic, were as safe as an abortion performed in a hospital setting.

Plaintiffs additionally called another alleged abortion expert, Dr. Warren Martin Hern, a doctor and general practitioner without board certification in the specialty of obstetrics and gynecology. Hern testified that first-trimester abortions, performed six to eight weeks from the last menstrual period are "probably the safest surgical procedure being performed in the United States in this category of procedures." [11] Dr. Hern further testified that the safest surgical method of first-trimester abortion was the "vacuum aspiration" method. This procedure is basically "a suc-

11. Dr. Hern defined "in this category of proce-    dures" as "procedures that involve invasion of a

tion removal of the uterine contents." [12]

The State of Illinois' expert, Dr. John J. Barton, a board-certified specialist in the fields of obstetrics and gynecology, also testified that first-trimester abortions performed in outpatient facilities (such as physicians' offices or ASTCs) present no greater risk than the risks and complication rates of abortions performed in hospitals. Based on the medical experts' testimony, it appears probable that first-trimester abortions could be safely performed in the surgeon's office. Thus, it appears that § 16(1) and its companion clause in ¶ 157–8.3(A) of the ASTCA would limit the availability of abortions by precluding the performance of abortions in a physician/surgeon's office.

In *Akron* the Supreme Court noted that where the abortion law "increased the cost and limited the availability of abortions," such a law would probably interfere with the woman's decision to have an abortion as well as its effectuation. *Akron,* 103 S.Ct. at 2492–93. Further, although dictum, the Supreme Court noted "that the medical evidence suggests that until approximately the end of the first trimester, the state's interest in maternal health would not be served by regulations that restrict the manner in which abortions are performed by a licensed physician." *Id.* at 2492 n. 11. The Court further observed that "uncomplicated abortions generally may be performed in a physician's office or an outpatient clinic up to 14 weeks from the first day of the last menstrual period." *Id.* (American College of Obstetricians and Gynecologists (ACOG), Standards for Obstetric–Gynecologic Services 54 (5th ed. 1982)). In light of the Supreme Court's caveat in *Akron* noting the probability that physicians can perform first-trimester abor-

tions in their offices; given the defendant's policy of nonenforcement regarding § 16(1) of the MPA and its companion clause in the ASTC, ¶ 157–8.3(A), requiring the licensure of any facility performing even one abortion; and after evaluating the evidence presented during the preliminary injunction hearing which established that first-trimester abortions performed in a controlled outpatient setting, including a physician's office, probably were as safe as abortions performed in hospitals, I would selectively enjoin the enforcement of § 16(1) of the MPA and its companion clause in the AST-CA definition without destroying the entire act because it is more likely than not that the plaintiffs would prevail on the merits in light of present Supreme Court precedent.

In so holding, I agree with the Illinois Supreme Court decision in *Village of Oak Lawn v. Marcowitz,* 86 Ill.2d 406, 55 Ill. Dec. 916, 427 N.E.2d 36 (1981), which also held that the ASTCA definition was constitutionally invalid as incorporated in a local ordinance which "closely resemble[d] the state [ASTC] act and implementing regulations adopted by the Department of Health." *Id.* 55 Ill.Dec. at 918, 427 N.E.2d at 38. The local ASTC ordinance also required an "initial license fee of $5,000, plus annual renewal fees of $2,000." *Id.* 55 Ill.Dec. at 919, 427 N.E.2d at 39. In *Marcowitz* the Illinois court, foreshadowing the caveat in *Akron,* stated:

> "Given the substantial licensing fee required and the detailed regulation involved, it seems inevitable that medical practitioners who might otherwise perform abortions for their regular patients, but whose facilities were not primarily devoted to surgery, would choose not to qualify under the ordinance. The right

body cavity or a major organ of some kind."

**12.** Dr. Hern noted that the fatality rate for abortion was about five per one million, whereas, the case fatality rate for term delivery was about 11 per 100,000 live births, which meant that the risk of term birth is approximately 25 times greater in terms of risk of death than abortion. Dr. Hern compared the abortion surgery risk factors to the risk factors of other types of outpatient surgery. He testified that "some estimates ... indicate tonsillectomies are at least twice as dangerous as abortions." Sim-

ilarly, Hern stated only that he consulted a colleague who informed him that laparoscopic surgery resulted in a death rate of two per 100,000. Hern testified: "Laparoscopic surgery involves the introduction of a laparoscope into the abdominal cavity. A laparoscope is a tube, a metal tube, that is hollow and is something that permits the physician to look through it into the cavity and is introduced through the umbilicus, with or without operating instruments."

of a woman considering a first-trimester abortion to seek the advice and services of her obstetrician, gynecologist, or other physician in whom she has trust and confidence may not be so drastically curbed."

*Id.* 55 Ill.Dec. at 922, 427 N.E.2d at 42.

Further, both § 16(1) of the MPA and the impermissible definition clause in the AST-CA,[13] can easily be severed from their respective acts without affecting the legislature's "essential purposes" for the acts' enactments. *See Zbaraz,* 763 F.2d at 1545. The MPA is virtually unaffected and capable of being enforced independently of § 16(1) and as such will continue to be used *inter alia* to revoke or suspend a malfeasant physician's license. Similarly, the AST-CA becomes "abortion neutral" once the invalid clause is removed from the definition of an ASTC. *See, e.g. Village of Oak Lawn v. Marcowitz,* 55 Ill.Dec. at 922, 427 N.E.2d at 42.[14] So construed, the ASTCA fully effectuates the legislature's primary purpose for its enactment, i.e., to regulate the rapidly developing trend of cost-effective ambulatory surgical medical units. Thus, the State of Illinois remains free to license any facility pursuant to the "abortion neutral" ASTCA "devoted primarily to the maintenance and operation of facilities for performance of surgical procedures," including an abortion facility, like Dr. Ragsdale's, devoted *primarily* to the performance of abortions.[15] As with other social and economic legislation, the test traditionally applied is whether or not the law has a "rational relation" to a valid state objective. *See Williamson v. Lee Optical Company,* 348 U.S. 483, 491, 75 S.Ct. 461,

466, 99 L.Ed. 563 (1955). Thus, I would apply the "rational relation" test to the now "abortion neutral" ASTCA.

The majority, however, disagrees and would apply the strict scrutiny test relying on mere dictum in *Friendship Medical Center Ltd. v. Chicago Board of Health,* 505 F.2d 1141 (7th Cir.1974), *cert. denied,* 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975). There the court observed:

"Furthermore, any proposed regulation, even if applied universally to all similar medical procedures, because of the fundamental right of a woman to procure an abortion during the first trimester, would have to meet a compelling governmental interest requirement. Thus, any general health regulations which would apply to first-trimester abortions would have to be limited so as to give effect to the fundamental rights as established by *Roe* and *Doe;* that is, not be burdensome on a woman's right to decide to abort a pregnancy. By this we mean that in all probability nothing broader than general requirements as to the maintaining of sanitary facilities and general requirements as to meeting minimal building code standards would be permissible."

*Id.* at 1153–54.

Initially, I point out that Judge Fairchild, concurring, rejected the *Friendship* majority's dictum, stating:

"Nevertheless, regulation of the safety of all these procedures, incidentally including first-trimester abortions, through imposition of generally applicable regulations, would seem to be a valid exercise of the state's interest in protecting

---

**13.** The unconstitutional clause of ¶ 157–8.3(A) of the ASTCA to be severed reads as follows: "or any facility in which a medical or surgical procedure is utilized to terminate a pregnancy, irrespective of whether the facility is devoted primarily to this purpose."

**14.** As I discuss, *infra,* the abortion-specific ¶ 157–8.6–1, as well as the abortion-specific regulations, are also severable; however, all but one of these provisions survive the strict standard articulated in *Roe.*

**15.** The majority baldly asserts that Dr. Ragsdale's practice consists exclusively of first-trimester abortions even though the record reveals

that Ragsdale performed some 40,000 abortions between 1973 and 1985. Up until the Illinois court's 1982 decision in *Poe v. Illinois Department of Public Health,* No. 78–C–4126 (N.D.Ill. 1982), which found the second-trimester hospital requirement unconstitutional, Ragsdale limited his practice to the performance of first-trimester abortions. However, Ragsdale testified that subsequent to *Poe,* he began performing second-trimester abortions. This obviously makes economic sense since the physician had the available licensed ASTC and would only lose income by refusing to perform second-trimester abortions.

health and need only satisfy the traditional [rational basis] test of judicial scrutiny imposed in this area."

*Id.* at 1155 (Fairchild, J., concurring). Because *Friendship*'s dictum to the contrary "was not refined by the fires of adversary presentation," it "was not a fully measured judicial pronouncement," and thus "not authoritative." *United States v. Crawley,* 837 F.2d 291, 293 (7th Cir.1988). This caveat is particularly applicable here where we are construing a legislative act regulating a broad field of medical services, including minor surgical procedures.

The majority gives two reasons, unsupported by this record, for relying on the *Friendship* dictum: "First, we cannot ignore the fact that the ASTCA was enacted primarily with abortion clinics in mind and only applied to outpatient surgical clinics generally in an effort to save the statute from unconstitutionality." However, as I demonstrated in part I, the legislative history establishes the contrary; the primary purpose of the ASTCA was to regulate the new cost-effective ASTCs in which semi-complicated (minor) surgery was performed. In effect the majority puts the cart before the horse because it rests its analysis of the ASTCA on the quagmire of legal dictum set forth in *Friendship* which ultimately clouds and confuses its analysis of the ASTCA.

The majority further states:

"Secondly, the state cannot, merely by applying the expedient and conclusory label 'surgery' to a medical procedure, apply requirements which would be necessary to major surgical procedures in the abortion context where they would be wholly inappropriate. It is as much a vice to treat abortion similarly to dissimilar procedures as it is to treat it differently from analogous procedures."

The majority's conclusory statement is incredible in light of the record. First of all, the plaintiff's own medical experts testified that an abortion was a surgical procedure (regardless of the type of abortion method used). On direct examination Ragsdale stated that an abortion "is a *minor surgical* procedure." Tr. at 420. Dr. Hern also

testified that an early abortion—one performed six to eight weeks from the last menstrual period—"is the safest *surgical procedure* being performed." Tr. at 241 and 260. Likewise, it was Dr. Barton's expert opinion that an *abortion constituted an operation,* Tr. at 452, and abortions "are classified as minor surgical procedures." Tr. at 467. Dr. Hern further stated that an abortion is a surgical procedure categorized as a procedure "that involve[s] invasion of a body cavity or a major organ of some kind." Tr. at 241. In reaching its conclusion that the state applied the "expedient and conclusory label 'surgery'" to an abortion, the majority once again disregards the record and strays far afield from its area of legal competence and makes medical judgments and pronouncements that are more properly reserved to those expertly trained in the medical scientific fields such as physicians, surgeons, nurses, medical technicians, etc.

Further, I observe that the courts have consistently alluded to abortions as a surgical procedure. In *Roe,* for example, Justice Stewart noted that the "protection of the health and safety of a woman" was a legitimate objective, amply sufficient "to permit a state to regulate abortions as it does other surgical procedures." *Roe v. Wade,* 410 U.S. at 170, 93 S.Ct. at 735 (Justice Stewart, concurring). Still more recently, in *Akron* the Supreme Court observed that the district court had found that "an abortion generally is considered a 'minor surgical procedure.'" *Akron,* 462 U.S. at 444, 103 S.Ct. at 2500 n. 35. Thus, the evidence establishes that an abortion is a surgical procedure, albeit a semi-complicated (minor) surgical procedure. Significantly, the ASTCA was intended to regulate all *minor surgical procedures,* including all types of abortive procedures performed in an ASTC; this the majority fails to recognize. There is no reason to apply strict scrutiny in this situation. There is no language in the Supreme Court's decisions upholding the majority's speculative and implicit theory that the Court intended to strike down social and economic legislation such as the ASTCA in the name of *Roe* or a

woman's limited right to terminate her pregnancy.

Further, in *Hodgson v. Lawson*, 542 F.2d 1350 (8th Cir.1976) (per curiam), the court addressed the issue of whether a state could subject the abortion decision, even during the first trimester, to regulations promulgated by the state board of health, including licensing requirements. The Eighth Circuit concluded:

"A state can impose the same regulations on a clinic, specifically built to perform abortions during the first trimester, that are imposed on other clinics that perform surgical procedures requiring approximately the same degree of skill and care as the performance of first-trimester abortions. As long as the regulations applying to abortion clinics are the same as those applied to other clinics performing similar surgical procedures, it would not be impermissible to make them specifically applicable to abortion clinics."

*Id.* at 1358.

Moreover, in *Baird v. Department of Public Health*, 599 F.2d 1098 (1st Cir.1979), the court upheld a state licensure statute applicable to any clinic providing medical, surgical, dental, restorative, or mental hygiene services, including facilities offering only first-trimester abortion services. The First Circuit held: *"There is room under Roe for states to apply the same licensing standards to abortion facilities as they apply to like facilities performing medically analogous procedures." Id.* at 1102 (emphasis added). *See also Westchester Women's Health Organization v. Whalen*, 475 F.Supp. 734, 739–40 (S.D.N.Y.1979); *Abortion Coalition v. Michigan Department of Public Health*, 426 F.Supp. 471, 477 (E.D.Mich.1977); *Hallmark Clinic v. North Carolina Department of Human Resources*, 380 F.Supp. 1153, 1157 (E.D.N. C.1974), *aff'd on other grounds*, 519 F.2d 1315 (4th Cir.1975). Thus, Illinois' laws licensing and regulating ASTCs are proper.

The law is very clear that a state has right to enact legislation for the protection of its citizens. *See Quilici v. Village of Morton Grove*, 695 F.2d 261, 274 (7th Cir. 1982) (Coffey, J., dissenting), *cert. denied*, 464 U.S. 863, 104 S.Ct. 194, 78 L.Ed.2d 170 (1983). The Supreme Court specifically stated:

"It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there. It is a vital part of a state's police power. The state's discretion in that field extends naturally to the regulation of all professions concerned with health."

*Barsky v. Board of Regents*, 347 U.S. 442, 449, 74 S.Ct. 650, 654, 98 L.Ed. 829 (1954). Thus, I am persuaded by the logic of Judge Fairchild's concurrence in *Friendship*, rather than by the unsupported and speculative conclusions of the majority, as well as the reasoning of the First and Eighth Circuits, that under *Roe* and its progeny a state has not only the power and authority, but also the duty, to regulate all medical facilities, particularly any facility where any surgical procedures are performed (including first-trimester abortions) as a valid exercise of its interest in protecting the health and welfare of its citizens while ensuring that the facilities will provide "conditions insuring maximum safety for the woman" who has decided to terminate her pregnancy. *Connecticut v. Menillo*, 423 U.S. at 11, 96 S.Ct. at 171.

The ASTCA and the regulations promulgated thereunder were intended to do just that, to protect the safety of its citizens, and is reason sufficient enough to sustain the validity of the statute. As in many other surgical procedures, there are a variety of similar medical and physical risks involved in having an abortion. Depending upon a particular woman's characteristics and development, medical and psychological problems may very well arise during the abortion procedure that only an experienced, well-trained, board-certified obstetrician and gynecologist is capable of recognizing and effectively treating in a properly designed, constructed, equipped, maintained, managed and medically approved facility. Depending upon the gestational duration of the embryo or fetus, such complications include, but are not limited to,

trauma, permanent damage to vital organs, dysfunction of the cardiovascular or respiratory system requiring cardio-pulmonary resuscitation, internal bleeding or hemorrhaging of the uterine wall, cervical lacerations, uterine perforation, embolism of the blood vessels, allergic reaction to medication or anesthesia, if administered, and even the permanent impairment of reproductive organs. Other medical factors that must be considered in making an informed abortion decision include the type of abortion to be performed (dilation and curettage, dilation and vacuum aspiration, dilation and evacuation, hysterotomy, or hysterectomy), the woman's medical history, her reaction to previous surgical procedures, her tolerance to certain medications, the chance that she is an RH-negative female, the likelihood of contracting a uterine infection, the chance that the placenta and fetus will not be completely removed, the potential for future difficulties in bearing children, and also the possibility of sexual sterility. It defies reason to allow the state to license an ASTC performing hernia surgery, cataract removals, and repairs of a torn or detached retina, but not permit the state to license ASTCs primarily performing abortions when there are many similar risks involved in the myriad types of abortive procedures.

Lastly, the majority asserts that it is irrational for the state to regulate the full-time provider of abortions (those primarily performing abortions) more heavily than the occasional provider. While it may be true that the full-time abortionist may consider himself or herself "more skilled" and so theoretically need less regulation, the majority overlooks that a state with limited resources may rationally choose to direct its energies to improving the lot of the greatest number. For example, if the state, after the proper enactment of legislation, chooses to regulate ASTCs and reduce the risk of minor surgery (as well as its cost) for 100,000 of its citizens, and more instrusive regulation of occasional providers would help only 2,000, the state may very properly deal with the 100,000 first. Further, the cost of regulation per patient will be lower if the state concentrates its

attention on high-volume businesses; surely this constitutes a rational relation to a permissible end.

The majority's treatment of the ASTCA and the IHFPA under the strict scrutiny test is just another way the majority circumvents and fails to effectuate the purpose of the ASTCA, i.e., to regulate changes in the provision of medical services. Essentially, the majority substitutes its judgment for that of the legislature; this is truly unfortunate in this case since courts should defer above all to a legislature's judgment on social and economic matters. *See Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Lawyers who are now judges are neither trained nor experienced in the medical disciplines possibly related to abortion procedures, e.g., obstetrics, gynecology, psychiatry, pathology, general surgery, or emergency medicine. Nor are judges versed in the nuances of the practices and techniques of the medical profession and thus are ill-equipped to substitute their views regarding what is medically adequate, proper, or antiseptic. "As recently stated by the Supreme Court, 'there certainly is no reason to think judges are better qualified than appropriate professionals in making such decisions.' " *St. Mary of Nazareth v. Dep't of Health & Human Services,* 698 F.2d 1337, 1346 (7th Cir.1983) (quoting *Youngberg v. Romeo,* 457 U.S. 307, 323, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982)). However, this majority decision is replete with such medical assertions. For example, the majority states, "The testimony regarding many of the physical plant requirements make clear that they have 'no medical justification whatsoever' when applied to first and early second trimester abortions of the type involved in this case." However, the ASTCA was intended to regulate *all minor surgical procedures,* and the legislature is free to enact reasonable legislation. Under these circumstances, and in light of the real risks that accompany minor surgical procedures, including abortions, it is dangerous for the majority to substitute its judgment as to what constitutes necessary and/or

appropriate ASTC regulations. Although in *Dandridge* the Supreme Court was concerned with welfare assistance programs, the following admonition is as applicable today as it was then:

"We do not decide today that the [Illinois] regulation is wise, that it best fulfills the relevant social and economic objectives that [Illinois] might ideally espouse, or that a more [reasonable] system could not be devised. Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure, certainly including the one before us. *But the intractable economic, social and even philosophical problems presented by [regulating medical services] are not the business of this [c]ourt.* The Constitution may impose certain procedural safeguards upon [the regulatory] system.... *But the Constitution does not empower this [c]ourt to second-guess state officials charged with the difficult responsibility of [guaranteeing its citizens adequate, cost-effective but safe, medical services.]*"

*Id.* 397 U.S. at 487, 90 S.Ct. at 1162–63 (citations omitted) (emphasis added). *See also In re U.S. ex rel. Missouri State High School, etc.*, 682 F.2d 147 (8th Cir.1982) ("Once a rational relationship exists, and it exists here, judicial scrutiny must cease. Whether the rule is wise or creates undue individual hardship are policy decisions better left to legislative and administrative bodies").

Lastly, because the courts "have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies," *Ferguson v. Skrupa*, 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963), the "abortion neutral" ASTCA is entitled to presumptive validity. It is a well-recognized principle that

"The question, whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture, that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. *The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other.*"

*Fletcher v. Peck*, 10 U.S. (6 Cranch) 85, 128, 3 L.Ed. 162 (1810) (emphasis added). " 'Every possible presumption ... is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt.' " *Powell v. Pennsylvania*, 127 U.S. 678, 684, 8 S.Ct. 992, 995, 32 L.Ed. 253 (1887) (quoting *In re Sinking Fund Cases*, 99 U.S. (9 Otto) 700, 718, 25 L.Ed. 496, 504 (1879)). *See also Kelley v. Johnson*, 425 U.S. 238, 247, 96 S.Ct. 1440, 1445–46, 47 L.Ed.2d 708 (1976) (Justice Rehnquist, now Chief Justice, stated that state decisions regarding social legislation are "entitled to the same sort of presumption of legislative validity as are state choices designed to promote other aims within the cognizance of the State's police power."). As the Supreme Court recently observed in *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601 (1984):

" 'It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way. *See, e.g., Ferguson v. Skrupa*, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); *Williamson v. Lee Optical Co.*, 348 U.S. 483, 487–488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955).' "

(quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976)). *See also Rhinebarger v. Orr*, 839 F.2d 387, 388 (7th Cir.1988)

(Chief Judge Bauer observed: "It is well established that congressional legislation 'adjusting the burdens and benefits of economic life' are presumed constitutional and that 'the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.' "). Here, the plaintiffs-appellees have not demonstrated that the Illinois legislature acted in an arbitrary or irrational way when enacting the ASTCA and the IHFPA. Thus, within the parameters of *Roe*, I am convinced that the state is free to regulate abortions to the same extent it regulates similar surgical procedures. I fail to understand how the majority holds otherwise since the Supreme Court has never held that *Roe* holds to the contrary. Thus, I would reverse the district court's order preliminarily enjoining the ASTCA and the IHFPA.

## III

However, even if *Roe* and its progeny were to apply to the ASTCA and IHFPA as asserted by the majority, the Act would still be constitutionally valid. The holding of *Roe* and its progeny

> "does not mean that a state never may enact a regulation touching on the woman's abortion right during the first weeks of pregnancy. Certain regulations that have no significant impact on the woman's exercise of her right may be permissible where justified by important state objectives."

*Akron*, 462 U.S. at 430, 103 S.Ct. at 2492. The plaintiffs asserted that the ASTCA and IHFPA substantially burdened the woman's right to terminate her pregnancy in three ways: (1) by limiting the availability of abortions; (2) by increasing the cost of an abortion; and (3) by requiring the provider to fulfill the certificate of need requirements subjecting the abortionist to a "public veto of his [abortion] services." As I previously noted, § 16(1) of the MPA and

its companion clause in ¶ 157–8.3(A) of the ASTCA could very well be considered unconstitutional and therefore should be enjoined. Thus, the licensure of facilities allegedly devoted primarily to the performance of abortions does not limit the availability of abortions since many other surgeons, if they so choose, could perform first-trimester abortions in their offices.[16] Thus, the ASTCA cannot be said to limit the availability of abortions. Further, the possibility that Ragsdale's clinic might possibly close does not significantly, if at all, affect the availability of abortions. The plaintiffs stated that "there are approximatley 65,860 abortions performed in Illinois annually." *Ragsdale v. Turnock*, 625 F.Supp. 1212, 1219 (N.D.Ill.1985). Of these, Ragsdale performs some 3,400 to 3,500 annually, or some 5 percent. Additionally, there are some 42 to 44 ASTCs in Illinois and "approximately half of these provide abortions services." *Id.* However, the district court found that Ragsdale was the only available abortionist in his area. The record reveals that Ragsdale initially testified that he was the "only provider" of abortions in his area. Subsequently, he qualified his testimony, stating he was "primarily, and, in many ways, the only abortion provider" in the area. However, Ragsdale concluded, stating: "To the best of my knowledge, no one else intends" to perform abortions in the area. These statements, contrary to the district court's finding that Ragsdale was the "only" abortion provider, do not establish that abortions would be unavailable in the area if Ragsdale had to close his facility (because he failed to lease or purchase a new facility). Inferring from the high volume of abortions performed at Ragsdale's clinic, it is apparent that the efficiency of the clinic had reached that of an "economy of scale," making it uneconomical for other physicians to enter the abortion market in the area. However, assuming *arguendo*, that abortionists receive anywhere from $250 to

**16.** In *Akron* the Supreme Court reaffirmed its trimester approach. Thus, I am convinced that the state could constitutionally require that all

second-trimester abortions be performed in an ASTC. Even the plaintiffs' experts testified that

$400 per abortion,[17] it is unlikely that another operator (like Ragsdale) would not perform abortions in the area in the event Ragsdale's business closed. The physician-surgeon entrepreneur could not ignore Ragsdale's apparent potential annual gross income from abortions alone, approximately $875,000 ($250 per abortion $\times$ 3500 abortions per year). The district court's finding that the closing of Ragsdale's clinic would make abortions unavailable is mere speculation and clearly erroneous.

The district court found the second burden on a woman's right to terminate her pregnancy created by the ASTCA licensing requirement was that the licensing requirement raised the cost of an abortion "by $25 to $40 for abortions performed at Ragsdale's clinic." The defendants argue that the district court erroneously relied on hearsay for the basis of its factual findings regarding the increased cost. I couldn't agree more since the defendants objected throughout the hearing to the relevancy and admissibility of Ragsdale's alleged cost sheets. The alleged cost sheets consisted of Ragsdale's musings after allegedly discussing tentative plans to move his facility with contractors and other vendors. Ragsdale, a physician and surgeon, is no more an expert in cost accounting, contracting, architecture, etc., than the respective experts in these areas are knowledgeable about the problems and practice of surgery and/or medicine. Thus, just as the majority rejected the defendant's architectural expert's testimony regarding the medical "need for the ventilation requirements," so too should the majority, on proper balance, reject Ragsdale's compliance cost estimates.

On the other hand, assuming *arguendo*, that Ragsdale's cost-related testimony was properly received in evidence, I am convinced that the important state health objective of insuring safe, yet cost-effective, medical service by requiring minimum engineering and construction standards justified the *de minimis* financial impact that compliance with the regulations places on the cost of an abortion. The majority inaccurately asserts that "Dr. Ragsdale testified that he estimated compliance with the regulations would entail a per-patient cost of between $25 and $40." The record reveals that Dr. Ragsdale testified that he estimated the added costs of complying with the regulations *over and above the costs required simply to relocate his current practice in such a manner as he deemed appropriate for his needs*, as $25.21 per patient. (Ragsdale Tr. 400–01). This added cost of $25.21 certainly cannot be considered as significantly more than the $19.40 (less than a $5 difference) increase per abortion for tissue examination upheld by the Supreme Court in *Ashcroft* because "in light of the substantial benefits that a pathologist's examination can have, this small cost is clearly justified." 462 U.S. at 490, 103 S.Ct. at 2524. Moreover, it should be pointed out that the increased cost testified to herein, unlike the one in *Ashcroft*, would at best only be temporary and not one that would remain *ad infinitum*. Dr. Ragsdale admitted that "much of the debt would be retired after two to five years." Thus, after two years the fee increase would be reduced to $10.90 per patient, and after five years to a mere $3.40 per patient. I am convinced that the minimum engineering and construction design requirements allegedly at issue, which ensure only that all surgical procedures performed in ASTCs, including first-trimester abortions, are performed in clean, sanitary, and safe structures are a substantial benefit to the health and safety of patients, and the miniscule financial impact referred to is clearly *de minimis* and justified.

One last observation respecting the cost of an abortion. After searching the record, I found no evidence establishing the cost of an abortion performed in a doctor's office.

the risks of an abortion rise substantially in the second trimester.

**17.** Plaintiff's counsel stated during closing argument before the district court that the fee charged in a hospital for an abortion was $1,000 and that the hospital fee was 2.5 to 4 times greater than the cost of an abortion performed in an outpatient facility (including a physician's office). Thus, according to plaintiff's counsel, an outpatient abortion costs $250 to $400.

However, the plaintiff's counsel during closing argument before the district court stated that the costs of an abortion performed in a hospital ($1,000) was 2.5 to 4 times as costly as that of one performed in a surgeon's office or in an outpatient clinic. These figures reflect that outpatient abortion costs, including those performed in a physician's office, range from $250 to $400 each. Thus, the $250 cost of an abortion performed in Ragsdale's ASTC, even if operating in full compliance with the Act, may in fact represent the low end of the abortion market price. This proposition supports my earlier observation that Ragsdale's clinic, because of its efficiency, dominated the local market. Further, assuming that Ragsdale's increased cost per abortion was $25.21, the percentage increase is in the range of 6 to 10 percent, certainly *de minimis*. It is not as if the price of an abortion went from $250 to $500, a significant burden.

This brings us to the third burden allegedly impinging upon a woman's qualified right to terminate her pregnancy, i.e., Certificate of Need (CON) for Ragsdale's ASTC and the related public hearing required pursuant to the IHFPA.[18] The majority unbelievably holds the certificate of need requirement unconstitutional for the reason, *inter alia*, that the public hearing accompanying a certificate of need created a public veto of a woman's qualified right to an abortion. The record establishes unequivocally that Ragsdale's landlord, a hospital, wished to terminate its lease with Ragsdale because Ragsdale failed to refer patients to the hospital. Ragsdale applied to the State of Illinois, pursuant to the ASTCA and IHFPA, for a license for his new facility. After a full investigation and subsequent to holding public hearings, the state agency found that there was *in fact a need for Ragsdale's medical services*. At the public hearing a number of citizens protested against abortions stating their pro-life positions. It stretches the imagination that one would write that the exercise of one's First Amendment rights to object to an issue be treated somehow as creating a burden on a woman's right to an abortion. The majority, however, asserts that "the state's unwillingness or inability to confine the proceedings [the public hearings on Ragsdale's CON for his ASTC] to its even arguably legitimate goals bolster our conclusion [that the CON] requirement cannot stand." This statement flies in the face of the fact that the state after due and considerate deliberations absent emotion or hysteria objectively analyzed and in fact found that need existed for Ragsdale's medical services. Although I have previously expressed that an individual, including an abortionist, should be free from picketing in front of his private home, *see Schultz v. Frisby*, 807 F.2d 1339, 1355 (7th Cir.1986) (Coffey, J., dissenting), *reh'g granted and decision vacated*, 818 F.2d 1284 (7th Cir.1987), *aff'd by equally divided vote* 619 F.Supp. 792, 822 F.2d 642 (7th Cir.1987), *cert. granted*, — U.S. —, 108 S.Ct. 692, 98 L.Ed.2d 644 (1988), public

---

**18.** Pursuant to ¶¶ 1155–1160 of the IHFPA, and as noted by the majority, "anyone seeking to open an ASTC [must] obtain a certificate of need for the facility from the Department of Public Health after a public hearing and a 120–day review period." A CON is granted if the State Board finds

"(1) that the applicant is fit, willing, and able to provide a proper standard of health care service for the community with particular regard to the qualification, background and character of the applicant, (2) *that economic feasibility is demonstrated in terms of effect on the existing and projected operating budget of the applicant and of the health care facility;* in terms of the applicant's ability to establish and operate such facility in accordance with licensure regulations promulgated under pertinent state laws; and in terms of the project-ed impact on the total health care expenditures in the facility and community, (3) that safeguards are provided which assure that the establishment, construction or modification of the health care facility is consistent with the public interest, and (4) *that the proposed establishment, construction or modification is consistent with the orderly and economic development of such facilities and is in accord with standards, criteria, or plans of need adopted and approved pursuant to the provisions of Section 12 of this Act* for such facilities for comprehensive health care in the community, area, or State served by such facilities."

111½ Ill.Rev.Stat. ¶ 1156 (emphasis added). In this manner the state has attempted to reduce skyrocketing health care costs by limiting the expansion of unnecessary medical facilities.

hearings are a different matter. Public hearings are an open forum where *all citizens* should have the right to be heard in an organized manner in our democratic form of government. That some open forums or demonstrations sometimes "degenerate into a shouting match" is nothing new to our right of free speech, much less to our national system of justice and ordered liberty. I fail to comprehend the majority's contrary view.

Further, the record in this case establishes that the ASTCA regulations in question place *no burden whatsoever* on a woman's decision to terminate her pregnancy in the first trimester because they reflect nothing but the common, accepted, and approved standards of medical practice and procedure as testified to by the medical experts. For example, § 205.240 of the ASTC regulations requires the management or owner of an ASTC to formulate written policies and a procedures manual. Dr. Ragsdale described this requirement as standard medical and administrative practice. Other administrative and organizational regulations, such as those requiring written safety plans (§ 205.510), appointment of a qualified consulting committee and medical director (§ 205.230), and written personnel policies (§ 205.310), as well as those requiring sanitary conditions (§ 205.420) and proper disposal of all materials from the abortion procedure and maintenance of the equipment in good working order (§ 205.-410) are merely enunciations of universally recognized standard practice for performing surgical procedures in an outpatient facility. As Dr. Ragsdale conceded on direct examination, most of the regulations of this type simply "stated the obvious" and in no way impinged upon a woman's decision, much less her right, to an abortion. Moreover, the building design and construction requirements contained in the ASTC regulations reflect proper engineering design and practice from a medical service point of view and accepted minimum standards for medical facilities. Examples include requirements for testing and balancing heating, ventilation, and air conditioning systems to ensure that they are in proper working condition (§ 205.-

1510), insulation in appropriate locations (§ 205.1520), and a minimum ceiling height of eight feet with appropriate exceptions for certain rooms, such as storage rooms (§ 205.1400). I believe that the state has more than just a compelling interest, and in fact has an overriding interest, in ensuring that any and all ASTCs performing any surgical procedures, including first-trimester abortions, are designed and constructed to meet basic engineering standards for medical facilities in order that all fairly sophisticated medical procedures are conducted "under conditions ensuring the maximum safety" of the patient. *Connecticut v. Menillo,* 423 U.S. at 11, 96 S.Ct. at 171.

Dr. Hern, the plaintiff's alleged expert witness at trial, testified that "90 to 95 percent ... of all first-trimester procedures in this country ... are performed by vacuum aspiration technique of some kind," and are "the safest surgical procedure[s] now performed." The record also established that other abortion procedures, such as the saline, urea, and installation techniques (involving inserting a needle into the amniotic cavity, withdrawing fluid, and installing a saline solution within the amniotic cavity) were also being performed in ASTCs. These abortion procedures have a higher complication and fatality rate than other abortion procedures, such as the vacuum aspiration and dilation and evacuation methods. Since more complicated and involved abortion procedures which require close supervision, control and regulation are also performed in ASTCs, I am persuaded that the state can, should, and must regulate its ASTCs in order that it might protect its citizens from possible serious medical problems which could very easily arise. The State of Illinois, through its legislators, has the authority, if it so determines, to require a higher standard for the operation of these clinics, including attending and supervising personnel, building specifications and design, as well as maintenance, in order that it might protect its citizens, just as the State of Wisconsin has the authority to require higher standards for its prisons and the State of Georgia to protect its inmates if it so wishes. *Cf.* Wis.

Administrative Code §§ HHS 302, *et seq.* with Georgia Code Annotated § 42–5–50, *et seq.* Similarly, the State of Illinois can pass legislation mandating more all-inclusive immunization requirements for school-age children than those required by the State of Missouri. *Cf.* Illinois Revised Statute Chapter 111.5, ¶ 22.11 and Illinois Administrative Code Tit. 77, § 696.10 with Missouri Revised Statute § 167.181.

The Illinois legislature has determined that the ASTCA and the IHFPA, by their very enactment, are very important social and economic laws for the betterment and protection of its citizens. Neither the ASTCA nor the IHFPA burden a woman's qualified right to terminate a pregnancy, and both Acts further serve the state's important interest in the health and welfare of its citizens; thus, even under *Roe* and its progeny the ASTCA and IHFPA must be held constitutional.

Finally, turning to those abortion-specific ASTCA regulations; I would hold that all but one of these abortion-specific regulations survive *Roe*'s scrutiny. Initially, I would hold that ¶ 157–8.6–1 [19] properly requires a physician actively engaged in practice at an ASTC be on the board of directors of any ASTC "devoted primarily to providing facilities for abortions" as a condition of licensure. Since the Supreme Court's decision in *Connecticut v. Menillo*, it has been clear that states can require that only physicians perform abortions. Illinois' additional requirement that a practicing physician/surgeon be on the board of an ASTC primarily involved in providing abortion services simply guarantees that a physician be involved in the business decisions of the board of directors (exclusive of the patient-doctor abortion decision) and thus ensure safe medical procedures and practices. Further, Dr. Ragsdale testified that ¶ 157–8.6–1 did not burden the woman's right to an abortion. Additionally, Margaret Moe, who desired to offer abortions out of her clinic, is now free (in light of the probable unconstitutionality of § 16(1) of the MPA and its companion clause in the ASTC definition) to do so as long as the clinic is not devoted primarily to surgical procedures. If Moe chooses to incorporate her clinic as an ASTC, she, without any trouble, will be able to retain a surgeon performing abortions at her clinic to serve on her ASTC board of directors. This requirement neither limits the availability nor increases the cost of an abortion performed at an ASTC and in fact serves the important state interest in protecting the health of its citizens. Thus, ¶ 157–8.6–1 is constitutional.

Further, the record reveals that those regulations addressing operative care do not burden a woman's right to an abortion. Section 205.530(c) of the ASTC regulations requires that all tissues removed during surgery be examined by a qualified consulting pathologist. The Supreme Court upheld an almost identical regulation in *Ashcroft*. The Court held that a Missouri regulation requiring all tissues surgically removed (including tissue removed during first-trimester abortions) be examined by a pathologist "reasonably related to generally accepted medical standards and 'further[s] important health-related state concerns.'" 462 U.S. at 487, 103 S.Ct. at 2523 (quoting *City of Akron*, 462 U.S. at 430, 103 S.Ct. at 2493). The Court stated: "As a rule, it is accepted medical practice to submit *all* tissue to the examination of a pathologist. This is particularly important following abortion, because questions remain as to the long-range complications and their effect on subsequent pregnancies." 462 U.S. at 487–88, 103 S.Ct. at 2523 (emphasis in original). Further, the information and knowledge gained from the aggregated pathological testing and reports will aid other women in the future. The requirement for a pathological report on any abnormalities in the tissue in ques-

---

**19.** Paragraph 157–8.6–1 provides:
"Abortions—Licensed physicians
§ 6.1 Notwithstanding any other provision of this Act, any corporation operating an Ambulatory Surgical Treatment Center devoted primarily to providing facilities for abortion must have a physician, who is licensed to practice medicine in all of its branches and is actively engaged in the practice of medicine at the Center, on the board of directors as a condition to licensure of the Center."

tion is proper and constitutional in light of *Ashcroft.*

Section 205.760 of the ASTC regulations requires a report, on forms provided by the Department of Public Health, of each abortion procedure performed in an ASTC within ten days following the month in which the abortion was performed. If the doctor who performed the abortion later discovers a complication, such as hemorrhaging, then he or she is required to file a supplemental report.[20] In *Planned Parenthood v. Danforth,* 428 U.S. 52, 96 S.Ct. at 2831, 49 L.Ed.2d 788 (1975), the Supreme Court stated:

> "Recordkeeping and reporting requirements that are reasonably directed to the preservation of maternal health and that properly respect a patient's confidentiality and privacy are permissible.... Recordkeeping of this kind, if not abused or overdone, can be useful to the state's interest in protecting the health of its female citizens, and may be a resource that is relevant to decisions involving medical experience and judgment.... As so regarded, we see no legally significant impact or consequence on the abortion decision."

*Id.* at 80–81, 96 S.Ct. at 2846 (footnote omitted). Further, Dr. Hern, one of the plaintiffs' alleged experts, testified specifically that the reporting of statistics "is essential to public health evaluation." Thus, the reporting requirements at issue are consistent with the Court's holding in *Danforth* and are constitutional.

Other abortion-specific regulations require a determination of blood RH factor prior to performance of an obstetrical procedure, including an abortion (§ 205.-730(a)(1)) and hemoglobin and hematocrit and urine analysis examinations before performing an abortion, as well as procedures performed with general anesthesia or local anesthesia with sedation (§ 205.520(b)). At trial, Dr. Ragsdale admitted that he had no disagreement with the need to perform ap-

propriate laboratory tests. Thus, these provisions in no way impinge upon a woman's decision to have an abortion because they merely state the standard medical tests necessary to perform a safe abortion. In this respect, they are no more offensive or intrusive on a woman's right to an abortion than § 205.710 which states: "Abortions shall be provided to the public with the same standards of safety, effectiveness, and regard for patients['] rights as any other health service." As Dr. Ragsdale's counsel concededly stated at trial, "Obviously, Dr. Ragsdale agrees with that statement. We agree with that, and I suspect everyone in this room agrees with that statement."

Finally, I do not agree with the majority's conclusion that the counseling requirements of § 205.730(b) run afoul of the Supreme Court's ruling in *Thornburgh v. American College of Obstetricians,* 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986). In *Thornburgh* the Court found unconstitutional provisions of the state statute that required a woman to be informed of fetal characteristics, the availability of financial assistance, detrimental physical and psychological effects, and all particular medical risks. *Id.* at 759–765, 106 S.Ct. at 2178–81. But the Court held that this detailed information exceeded the state's interest in describing the general subject matter relevant to informed consent because it "is not medical information that is always relevant to the woman's decision and it may serve only to confuse and punish her and to heighten her anxiety contrary to accepted medical practice." *Id.* at 762, 106 S.Ct. at 2179.

In contrast, the counseling requirements of § 205.730(b) include a description of the procedure to be performed, an explanation of risks and possible complications, and a discussion of alternatives. These requirements are significantly less intrusive than the ones invalidated in *Thornburgh,* and

---

**20.** In a companion regulation which is not abortion specific, § 205.620 requires each ASTC to submit annual statistical data to the Department of Public Health. This data is to include the number and type of procedures performed and complications reported, the number of patients requiring transfer to a hospital due to complications, the number of patients returning for followup contact, and the number of deaths.

the record establishes through Dr. Hern's testimony as an expert witness, that counseling is an indispensable part of a thorough pre-operative evaluation and preparation of a patient for an abortion procedure. Dr. Hern testified that appropriate counseling should include a discussion of the alternatives for dealing with pregnancy.[21] As the Supreme Court has repeatedly recognized, "The decision to abort ... is an important, and often stressful one, and it is desirable and imperative that it be made with full knowledge of its nature and consequences." *Danforth,* 428 U.S. at 67, 96 S.Ct. at 2840. *See also City of Akron,* 462 U.S. at 442–43, 103 S.Ct. at 2499.[22] This is true since "[a]bortion is inherently different from other medical procedures, because no other procedure involves the purposeful termination of potential life." *Harris v. McRae,* 448 U.S. 297, 325, 100 S.Ct. 2671, 2692, 65 L.Ed.2d 784 (1980). Thus, I emphasized in *Zbaraz v. Hartigan,* 763 F.2d at 1549–50 (Coffey, J., dissenting):

"There are severe psychological and emotional stresses involved not only before and during the abortion procedure, but for days, months and even years following the procedure.... For many individ-

uals ... the abortion decision raises questions that are often influenced by sincere, deep-rooted religious beliefs, moral principles, and convictions.... [J]ust as in any surgical procedure, [a woman] is entitled to an explanation of the reasonable alternatives to abortion...."

I am firmly convinced that Illinois can require a counselor to provide a woman with a description of the procedure to be performed, an explanation of risks and possible complications, and a discussion of alternatives so that the woman can make a *responsible enlightened choice* in light of the fact that no other medical procedure "involves the purposeful termination of a potential life." *Harris v. McRae,* 448 U.S. at 325, 100 S.Ct. at 2692. Further, the majority's rejection of the counseling requirements ignores the recent trend in medicine which encourages patients to seek second opinions before undergoing surgical procedures. In some instances insurance companies have even required a second opinion with respect to non-emergency surgeries before providing coverage. These developments reflect the importance the medical profession (as well as those footing

---

**21.** Dr. Hern, the court-qualified expert, testified as follows:

"Q Now, you testified earlier that you do provide counseling in your facility, is that right, doctor?
A Yes.
Q ... well, why do you provide [counseling], Dr. Hern?
A Well, I believe that it is important for each patient to have not only a good understanding of the procedure that she is going to be having *and how she got pregnant* [?!] and what the methods are for her, I mean, for her to be permitted or to permit her to avoid unwanted pregnancies in the future.
Q Well, do you say the same things to every patient, Dr. Hern? Do you give the same counseling?
A In general, yes. Although it really depends upon the individual patient as to how much we give as to that but I also think that—how much emphasis *we give* and as to what, but, as I say, it is also important for the patient to have an opportunity to express her feelings about the pregnancy and about the abortion and, perhaps, the relationship in which it occurred.
Q *Would you always,* Dr. Hern, for example, *inlude in your discussion with the woman a*

*discussion of the alternatives for dealing with pregnancy?*
A *Yes.* And depending also to some extent on the patient's interest in this subject. *Some patients absolutely refuse to discuss alternatives; they come in and they have their minds absolutely made up about what they want to do and they are impatient to get on with the process and they really do not wish to spend a great deal of time talking about, for example, adoption."*
(Emphasis added).

**22.** According to the majority, the counseling requirement and in particular "the requirement of a 'discussion of alternatives' is unconstitutional." The majority relied on Ragsdale's testimony to the effect that discussions of *alternatives* might not be appropriate. Ragsdale speculated that it would be inappropriate to inform a woman of alternatives if her continuing health was dependent on her undergoing a medically necessary abortion. Obviously, in this situation a "discussion of alternatives" is inappropriate simply because there are no *alternatives.* The majority's interpretation of the Illinois regulations would lead to absurd results. It is clear that a discussion of alternatives is required *only* when alternatives in fact exist.

the bill) places on informed consent. The Illinois counseling regulations merely require that a woman planning to terminate her pregnancy do so knowingly; *Roe* does not hold to the contrary. However, § 205.730(b)(2)(D) requires that "[c]ounselors shall have no financial interest in the patient's decision" and appears to interfere with the physician-patient relationship and should be severed and enjoined. Thus, I do not believe that the counseling requirements of § 205.730(b), except (2)(D), are improper and would uphold their validity.

## IV

In conclusion, I am convinced that individual states have the obligation, the duty, and the power to license medical ASTC facilities where semi-complex (minor) surgical procedures, including first-trimester abortions, are performed as a valid exercise of a state's interest in protecting health and ensuring maximum safety for the patients. Determining where to strike the balance between competing interests is a matter for the legislature, not for the court. The Constitution wisely vests the legislative branch of the government with the power and authority to enact laws, for the legislature is better equipped to carry out that task in that interested parties, such as state and local governmental representatives, medical experts, etc., are able to present their respective positions before the legislative body in a more open, unrestricted, informal forum. Thereafter, the myriad of questions and problems, as well as their possible solutions, are brought before the entire legislative branch of government and are subject to the scrutiny of public hearing and debate. When dealing with the complex and ever-changing question of how to provide the best health care at a reasonable cost to its citizens, the factfinding and policy making capabilities of a court of law are far more limited and confined due to the very nature of a court of law. A truly independent judiciary must always exercise its powers of review and decision making with discretion and reservation, recognizing that we are not competent to make social and economic policy decisions ,and giving due deference to the legislative branch of government. Our ju-

dicial responsibility obligates us to declare an act by another governmental unit to be void only if we believe the enacted law is contrary to the Constitution. After reviewing the ASTCA and the challenged provisions of the IHFPA, I am convinced that the expressed will of the people as enacted in these Illinois statutes is not contrary to the principles of the Constitution; thus, I would not interfere with this well-reasoned judgment of the Illinois legislature, a coequal branch of the government. Surely the Illinois legislature is entitled to require that all surgical procedures, including first-trimester abortions, are performed "under conditions ensuring maximum safety for the woman [as well as the man]." *Connecticut v. Menillo*, 423 U.S. at 11, 96 S.Ct. at 171.

Moreover, other than § 16(1) of the MPA, its companion clause in the ASTCA, and § 205.730(b)(2)(D), I believe that the statutes and regulations in question do not place a burden on a woman's decision to terminate her pregnancy in the first trimester. Further, if one is able to find a burden, it is certainly below the level of *de minimis*. Lastly, the regulations reflect common, accepted and approved standards of medical practice and procedure and are designed to enhance the safety of Illinois' citizens, an important state interest. For the foregoing reasons, I would reverse the order of the district court.

## APPENDIX

---

### TITLE 77 ILLINOIS ADMINISTRATIVE CODE: PUBLIC HEALTH

### CHAPTER 1: DEPARTMENT OF PUBLIC HEALTH

### SUBCHAPTER b: HOSPITALS AND AMBULATORY CARE FACILITIES

### PART 205

### MINIMUM STANDARDS, RULES AND REGULATIONS FOR THE LICENSURE OF AMBULATORY SURGICAL TREATMENT CENTERS.

---

### SUBPART A: GENERAL

Section 205.120 Licensure

a) An application for license shall be made to the Department on forms provided by it. This application shall contain the information required under the Act and this Part. The application shall be submitted not less than sixty (60) days prior to the date of intended operation.

b) The application shall include but not be limited to the following information:

1) the name(s) and address(es) of person(s) who own and/or operate the facility and the name under which they do business. A corporation shall submit:

A) a copy of its certificate of incorporation,

B) list of the title, name, and address of each of its corporate officers,

C) list of the name and address of each of its shareholders holding more than 5%, of the shares.

2) location of the facility.

3) description of the facility including but not limited to interviewing, examination, surgical, and recovery room facilities.

4) schematic architectural plans.

5) documentation of compliance with all applicable building, utility and Safety Codes.

6) description of services to be provided by the facility including a list of surgical procedures to be performed.

7) list of all personnel including their name, address, position, qualifications and licensure.

8) All applications shall be signed by the applicant and the application shall include a verification form acknowledging the application to be true and complete and certifying that the applicant has knowledge of and understands the action required to comply with the Act and licensing requirements. The form shall be verified by a notary public. The forms shall be accompanied by a license fee of $500.

9) As a condition of the issuance or renewal of the license of any Ambulatory Surgical Treatment Center:

A) The applicant shall file a statement of ownership. The applicant shall agree to update the information required in the statement of ownership every 6 months from the initial date of filing,

B) Each license shall file an attested financial statement with the Department by July 1, 1980 and at times thereafter as required,

C) Financial statements shall be filed annually on or before April 1, of each year for the previous calendar year, or within three (3) months after the close of the fiscal period of the licensee,

D) A financial statement shall be filed with the Department on forms provided by the Department or on annual financial statements prepared on forms used by the applicant. At minimum, they shall include detailed balance sheets, statements of income and statements of expense,

E) Every facility licensed under this Act, and any premises proposed to be conducted as a facility by an applicant for a license shall be open during its regular business hours to an inspection authorized in writing by the Director. No notice need be given to any person prior to any inspection,

F) Any corporation operating an Ambulatory Surgical Treatment Center devoted primarily to providing facilities for abortion must have a physician who is licensed to practice medicine in all of its branches and is actively engaged in the practice of medicine at the center, on the Board of Directors as a condition to licensure of the center.

c) Only those facilities, services, programs and procedures included in the application shall be licensed.

A new application is required for the following:

1) change in ownership,

2) change in location,

3) remodeling of facility so as to change the interviewing, examination,

surgical or recovery room space or number,

4) addition of services or programs.

AGENCY NOTE: The addition of new specialty services, for example, podiatry or obstetrics/gynecology, may require changes in consulting committee, procedures and/or staffing. Therefore, the Department finds that a new license is needed.

d) The license shall be valid for one (1) year, unless sooner suspended or revoked, shall be renewable annually upon approval by the Department and payment of a license fee of $300. Each license shall be issued only for the premises and persons named in the application and shall not be transferable or assignable. The licenses shall be posted in a conspicuous place on the licensed premises. A placard or registry of all physicians on staff in the facility shall be centrally located and available for inspection to any interested persons. The renewal application shall be on forms provided by the Department and shall be submitted to it not less than 30 days prior to the expiration date.

e) The facility shall give written notice to the Department within seven (7) days of any of the following:

1) change of administrative staff,

2) change of medical director,

3) change of staff physicians,

4) change of supervising nurse,

5) addition or deletion of surgical procedures performed,

6) in the case of a corporation change in any shareholders equity involving 5% or more interest.

(Source: Amended at 6 Ill.Reg. 6220, effective May 17, 1982)

\* \* \*

## SUBPART D: EQUIPMENT, SUPPLIES, AND FACILITY MAINTENANCE

Section 205.410 Equipment

Equipment shall be in good working order and shall be available in numbers sufficient to provide good patient care based on the procedures to be performed in the facility.

a) There shall be monitoring equipment, suction apparatus, oxygen and related items available within the surgical and postoperative recovery area. Cardiac pulmonary resuscitation equipment shall be available in all facilities.

b) There shall be written procedures governing the care, use, sterilization, storage and disposal of all materials to insure that an adequate supply of sterile equipment is available for each procedure. The section on "Sterilization and Disinfection" from Infection Control in the Hospital, most recent edition, American Hospital Association, shall be used as the guideline.

c) There shall be written procedures to assure safety in storage and use of inhalation anesthetics and medical gases. The current edition of the National Fire Protection Association Code (Standard No. 56a) shall be used as the standard.

d) There shall be written procedures to assure the safety in storage and use of all narcotics and medications in accordance with state and federal law.

(Source: Amended at 3 Ill.Reg. 30, p. 371, effective July 23, 1979)

\* \* \*

## SUBPART E: GENERAL PATIENT CARE

Section 205.520 Preoperative Care

a) Where medical evaluation, examination, and referral are made from a private physician's office, hospital, or clinic, pertinent records thereof shall be available and made part of the patient's clinical record at the time the patient is registered and admitted to the ambulatory surgical treatment center.

b) A complete medical history shall be obtained and the physical examination shall be complete. A hemoglobin or hematocrit and examination of the urine for sugar, protein, and acetone shall be performed by a qualified laboratory technician prior to the following procedures:

1) those performed with general anesthesia,

2) those performed with local anesthesia with sedation,

3) those performed to terminate pregnancy.

c) A written statement indicating informed consent and a signed authorization by the patient for the performance of the specific surgical procedure shall be procured and made part of the patient's clinical record.

d) Surgical procedures shall not be performed on patient's having medical, surgical, or psychiatric conditions or complications as specified by the consulting committee in the facility's written policies.

(Source: Amended at 6 Ill.Reg. 10974, effective August 30, 1982)

Section 205.530   Operative Care

a) Surgical procedures shall be performed only by a qualified physician, dentist or podiatrist within the limits of his/her defined specific practice privileges.

b) A qualified anesthesiologist, a dental anesthesiologist or a certified registered nurse anesthetist, medically directed by a licensed physician who administers or directs the administration of anesthesia in an Illinois licensed hospital, shall be present for the administration of anesthetics and recovery of patients when any general or major regional anesthetic is used.

c) All tissues removed during surgery shall be examined by a consulting pathologist and all x-rays shall be read by a consulting radiologist who shall provide a written report of his/her examination to the attending physician. A copy of this report shall be filed in the patient's clinical record within seven (7) days.

(Source: Amended at 6 Ill.Reg. 13337, effective October 20, 1982)

\*   \*   \*

SUBPART G: ADDITIONAL REQUIREMENTS FOR FACILITIES IN WHICH OBSTETRICAL/GYNECOLOGICAL PROCEDURES ARE PERFORMED

Section 205.710   Abortions

Abortions shall be provided to the public with the same standards of safety, effectiveness, and regard for patients rights as any other health service.

(Source: Amended at 3 Ill.Reg. 30, p. 371, effective July 23, 1979)

Section 205.720   Personnel

At least one registered professional nurse with postgraduate education or experience in obstetrical or gynecological nursing shall supervise and direct the nursing personnel and care of patients having obstetrical procedures.

AGENCY NOTE: Procedures involving the pregnant uterus are subject to particular complications and postoperative care requires a special knowledge on the part of nursing staff.

(Source: Amended at 3 Ill.Reg. 30, p. 371, effective July 23, 1979)

Section 205.730   General Patient Care

a) Examination

1) Prior to obstetrical procedures blood Rh factor shall be determined by a qualified laboratory technician for every patient.

2) The physician performing an abortion procedure shall establish the diagnosis of pregnancy by appropriate clinical evaluation and testing prior to performing an abortion procedure.

3) Time shall be allowed between the initial examination and termination of pregnancy to permit the reporting to and reviewing of all laboratory tests with the patient by the facility physician.

b) Counseling

1) Counseling shall be provided following disclosure to the patient of the diagnosis of pregnancy, and prior to performance of any surgical procedure. It shall be done individually and in a room designated for such use which shall not be the procedure room.

2) All facilities shall provide orientation training for counselors and insure that each counselor is qualified to:

A) Counseling shall be done by a person qualified to:

i) discuss alternatives for dealing with an unwanted pregnancy;

ii) describe the procedures used in the facility;

iii) explain the risks and possible complications of each procedure;

iv) provide contraception information.

B) Demonstration of such counseling qualifications shall be required by the Department.

C) Documentation of orientation training shall be required by the Department.

D) Counselors shall have no financial interest in the patient's decision.

3) Counseling shall include a discussion of alternatives, description of the procedure to be performed, explanation of risks and possible complications. Contraceptive information may be provided postoperatively. Group counseling may be provided in addition to individual counseling. The patient's clinical record shall include documentation of the counseling received.

AGENCY NOTE: In the opinion of the Ambulatory Surgical Treatment Center Licensing Board, the patient should make a decision concerning the procedure in an atmosphere free from coercion. Consequently, the Board believes this is best accomplished in a room separate and apart from the procedure room. The Board believes that it is difficult to reach a truly voluntary decision while the patient is undressed and on the procedure table.

(Source: Amended at 5 Ill.Reg. 12756, effective November 4, 1981)

Section 205.740 Preoperative Requirements

Abortions may be performed in a ambulatory surgical treatment center on only those patients with gestation up to and including 12 weeks commencing with ovulation rather than computed on the basis of the menstrual cycle, as determined by the physician, if the patient's medical condition permits. Abortions shall not be performed in an Ambulatory Surgical Treatment Center on those patients whose gestation exceeds 12 weeks.

(Source: Amended at 3 Ill.Reg. 30, p. 371, effective July 23, 1979)

Section 205.750 Postoperative Requirements

a) Each obstetrical/gynecological service shall provide Rh factor sensitization prophylaxis to all Rh negative patients according to standard medical procedures.

b) Information on availability of family planning services shall be provided, when desired by the patient. When, in the physician's opinion, it is in the best interest of the patient and with the patient's consent, family planning services may be initiated prior to the discharge of the patient.

(Source: Amended at 5 Ill.Reg. 12756, effective November 4, 1981)

Section 205.760   Reports

a) A report of each abortion procedure performed in an ambulatory surgical treatment center shall be made to the Department on forms provided by it. These reports shall be submitted not later than ten (10) days following the month in which the abortion was performed. Reports shall be submitted on procedures performed whether or not the patient was pregnant.

b) Reports shall not be filled out in such a manner or at such a time as to avoid accurate reporting of complications.

c) If the facility becomes aware of a complication following the submission of the original report, then a supplemental report shall be submitted to the Department.

(Source: Amended at 3 Ill.Reg. 30, p. 371, effective July 23, 1979)

*     *     *

SUBPART I: BUILDING DESIGN, CONSTRUCTION STANDARDS, AND PHYSICAL REQUIREMENTS

Section 205.1320   General Considerations

a) Location

This facility shall be identifiably separate from other facilities and functions.

b) Narrative Program

The sponsor for each project shall provide a narrative program of functions for the facility which contains space requirements, staffing patterns, departmental relationships and other basic information relating to the fulfillment of the institution's objectives. This may be a general or detailed description of each function to be performed, space needed for these functions, hours of operation, number of staff or other occupants of the various spaces, types of equipment required, interrelationship of various functions and spaces, and description of those services necessary for the complete functioning of the facility but which are available elsewhere in the community and, therefore, need not be duplicated in this facility. Explain the type of surgery or procedures, the volume of work, the number of doctors, etc.

c) Size

The extent (number and types) of the diagnostic, clinical, and administrative facilities to be provided shall be determined by the services contemplated and the estimated patient load as described in the narrative program.

d) Provisions for the Handicapped

The design shall provide for accessibility to the physically handicapped (public, staff, and patients).

e) Privacy for Patient

The design of the facility shall provide for the privacy and dignity of the patient during interview, examination, and treatment.

(Source: Amended at 6 Ill.Reg. 6220, effective May 17, 1982)

\* \* \*

Section 205.1360   Clinical Facilities

a) Examination room(s)

1) Each examination room(s) shall have a minimum clear floor area of 80 square feet, and a minimum dimension of 8 feet, excluding such spaces as vestibule, toilet, closet, and work counter (whether fixed or movable). Arrangements shall permit at least 2'–6" clearance at each side and at both ends of the examination table.

2) A lavatory or sink equipped for handwashing with knee or foot control shall be provided.

3) A counter or shelf space for writing shall be provided.

b) Procedure room(s)

1) Provide at least one procedure room with a minimum clear area of 250 square feet and a minimum dimension of 14 feet, exclusive of fixed and movable cabinets and shelves. Any other procedure rooms shall not be less than 120 square feet with a minimum dimension of 10 feet.

2) Provide a communication system connecting with the control station.

3) Provide special features such as x-ray film illuminators, and storage space as required by the program.

c) Recovery room(s)

1) Room(s) for post-anesthesia recovery for surgical patients shall be provided.

2) Recovery room(s) shall contain a minimum of 100 square feet of usable floor space for single bed occupancy and at least 80 square feet per bed for multiple bed occupancy, so arranged that there will be at least 3 feet between beds and 4 feet of clear space at the foot of each bed.

3) This room(s) shall contain a drug distribution station, handwashing facility, charting facilities, nurses' station, and storage space for supplies and equipment.

4) Provide a toilet which is accessible to the recovery room, without having to leave the recovery room to reach it. The water closet shall be equipped with a gray diverter valve.

5) A separate supervised room may be provided for use by patients who are able to leave the recovery (post-anesthesia) room but need additional time for all vital signs to be stabilized to the point where the patient may leave the

facility. This room shall be equipped with reclining or lounge type chairs for patients and shall contain a minimum of 50 square feet of usable floor space for each patient to be accommodated at any one time.

6) These recovery rooms may be combined, if desired.

7) Provide a minimum of four recovery beds or lounge chairs for each procedure room. At least one of the four must be a bed, and the other three may be lounge chairs or beds.

(Source: Amended at 6 Ill.Reg. 6220, effective May 17, 1982)

Section 205.1370  Support Service Areas

a) A control station shall be located to permit visual surveillance of all traffic which enters the operating suite.

b) Provide sterilizing facility(ies) with high speed autoclave(s) conveniently located to serve all procedure rooms. Approved alternate provisions may be made for replacement of sterile instruments during surgery.

c) A drug distribution station shall be provided for storage and preparation of medication to be administered to patients.

d) Scrub stations with knee or foot or elbow actuated faucets shall be provided near the entrances to the procedure rooms. Scrub facilities shall be arranged to minimize splatter on nearby personnel or supply carts.

e) A soiled workroom for the exclusive use of the surgical suite staff shall be provided. The soiled workroom shall contain a work counter, sink equipped for handwashing, waste receptacle, and linen receptacle. This room may be used for cleaning anesthesia equipment.

f) Fluid waste disposal facilities shall be conveniently located with respect to the general procedure rooms.

g)

1) A clean workroom or a clean supply room is required when clean materials are assembled within the surgical suite prior to use. A clean workroom shall contain a work counter, sink equipped for handwashing, and space for clean and sterile supplies. A clean supply room shall be provided when the narrative program defines a system for the storage and distribution of clean and sterile supplies which would not require the use of a clean workroom.

2) An autoclave shall be incorporated into the clean workroom.

h) Anesthesia storage facilities shall be provided. Flammable anesthetics are prohibited.

i) Medical gas supply storage with space for reserve nitrous oxide and oxygen cylinders shall be provided, with all tanks properly secured.

j) Storage area for equipment and supplies used in surgical suite shall be provided.

k) Staff and personnel facilities shall be provided for male and female personnel (orderlies, technicians, nurses, and doctors) working within the surgical suite. The areas shall contain lounge, lockers, toilets, lavatories equipped for handwashing, and space for changing clothing. These areas shall be arranged to provide a one-way traffic pattern so that personnel entering from outside the surgical suite can change, gown, and move directly into the surgical suite. Space for removal of scrub suits and foot covers shall be designed so that personnel using it will avoid physical contact with clean personnel.

l) Provide change areas where patients can change from street clothing into hospital gowns in privacy, and be prepared for surgery. This shall include lockers, toilets, clothing change or gowning area(s), and space for the administration of medications.

m) Stretcher storage area shall be out of direct line of traffic.

n) Janitor's closet containing a floor receptor or service sink, and storage space for housekeeping supplies and equipment shall be provided exclusively for the surgical suite.

(Source: Amended at 6 Ill.Reg. 6220, effective May 17, 1982)

## Section 205.1380   Diagnostic Facilities

If the pre-admission evaluation tests are to be performed within the facility, the following services shall be provided.

a) Radiographic suite, if provided, shall contain the following:

1) film processing area

2) viewing and administration area

3) film storage facilities

4) toilet room with handwashing facilities, directly accessible from each fluoroscopy room without entering the general corridor area.

5) dressing area with convenient access to toilets.

b) Laboratory suite shall contain the following minimum facilities:

1) Laboratory work counter with sink and vacuum, and electric services.

2) Lavatory or counter sink equipped for handwashing.

3) Storage cabinet or closet.

4) Specimen collection facilities equipped with a toilet and lavatory.

5) Blood collection facilities shall have space for a chair and work counter.

(Source: Amended at 6 Ill.Reg. 6220, effective May 17, 1982)

\*      \*      \*

## Section 205.1400   Details and Finishes

a) Minimum public corridor width shall be 5'-0", except those corridors where patients are transported in stretchers or carts shall be 8'-0".

b) The facility or section shall have at least two exits remote from each other. Other details relating to exits and fire safety shall be in accordance with Section 13 (Business Occupancy) of the latest edition of NFPA Standard 101 and the requirements outlined herein. These Standards govern where different from the code.

c) Items such as drinking fountains, telephone booths, vending machines, and portable equipment shall be located so as not to restrict corridor traffic or reduce the corridor width below the required minimum.

d) All doors to toilets which may be used by patients shall be equipped with hardware which will permit access in an emergency.

e) The minimum width of doors for patient access to examination and treatment rooms shall be 3'-0".

f) The minimum width of doors to rooms needing access for stretchers (procedure rooms, recovery) shall be 3'-8".

g) Doors on all openings between corridors and rooms or spaces subject to occupancy, except elevator doors, shall be swing type.

h) Doors, except doors to spaces such as small closets which are not subject to occupancy, shall not swing into corridors in a manner that might obstruct traffic flow or reduce the required corridor width.

i) Doors, sidelights, borrowed lights, and windows in which the glazing extends downs to within 18 inches of the floor (thereby creating possibility of accidental breakage by pedestrian traffic) shall be glazed with safety glass, wire glass, or plastic glazing material that will resist breaking and will not create dangerous cutting edges when broken in accordance with the State of Illinois Safety Glazing Materials Act (Ill.Rev. Stat.1981, ch. 111½, par. 3101 et seq.). Similar materials shall be used in wall openings unless required otherwise for fire safety.

j) Thresholds and expansion joint covers shall be made flush with the floor surface to facilitate use of wheelchairs and carts.

k) Air dryers, or paper towel dispensers and waste receptacles shall be provided at all handwashing fixtures.

l) Where labeled fire doors are required, these shall be certified by an independent testing laboratory as meeting the construction requirements equal to those for fire doors in National Fire Protection Association (NFPA) Standard 80. Reference to a labeled fire door shall be construed to include labeled frame and hardware.

m) Radiation protection requirements of X-ray and gamma ray installations shall conform to the requirements of

the Department of Nuclear Safety Rules for Protection Against Radiation (32 Ill.Adm.Code, Subchapter b) and should follow guidelines of NCRP reports # 33 dated February 1968, and # 49 dated September 1976. Provisions shall be made for testing and completed installation before use, and all defects must be corrected before use.

n) The minimum ceiling height shall be 8'-0", with the following exceptions:

1) Boiler rooms, if provided, shall have ceiling clearance not less than 2'-6" above the main boiler header and connecting piping.

2) Radiographic and other rooms containing ceiling-mounted equipment and including those with ceiling-mounted surgical light fixtures shall have height required to accommodate the equipment and/or fixture.

3) Ceilings in corridors, storage rooms, toilet rooms, and other minor rooms may be not less than 7'-8".

4) Suspended tracks, rails, and pipes located in path of normal traffic shall be not less than 6'-8" above the floor.

o) Flammable Anesthetics are prohibited.

p) Cubicle curtains and draperies shall be noncombustible or rendered flame retardant and shall pass both the large and small scale tests of NFPA Standard 701.

q) Interior finish of walls and ceilings of all exit ways, storage rooms, and areas of unusual fire hazard shall have a flame spread rating of not more than 25.

r) Floor finish materials shall have a flame spread rating of not more than 75. If a separate underlayment is used with any floor finish material, the flame spread test assembly shall include the underlayment.

s) All interior finish materials shall have smoke developed rating of 450 or less. The use of materials known to produce large amounts of toxic gases shall be avoided.

t) Floor materials shall be easily cleanable and have wear resistance appropriate for the location involved.

1) In all areas frequently subject to wet cleaning methods, floor materials shall not be physically affected by germicidal and cleaning solutions.

2) Floors that are subject to traffic while wet, shall have a nonslip surface.

u) Wall finishes shall be washable and in the immediate area of plumbing fixtures, shall be smooth and moisture resistant.

v) Floor and wall penetrations by pipes, ducts, and conduits shall be tightly sealed to minimize entry of rodents and insects. Joints of structural elements shall be similarly sealed.

w) Ceilings shall be cleanable and those in sensitive areas such as surgical rooms shall be readily washable and without crevices that can retain dirt particles. These sensitive areas shall have a finished ceiling, covering all overhead ductwork and piping.

x) Finished ceilings may be omitted in mechanical and equipment spaces, shops, general storage areas, and similar spaces, unless required for fire-resistive purposes.

y) Acoustical ceilings are recommended in corridors, multipurpose rooms, and waiting areas.

(Source: Amended at 6 Ill.Reg. 6220, effective May 17, 1982)

\* \* \*

## SUBPART J: MECHANICAL

Section 205.1540 Air Conditioning, Heating and Ventilating Systems

a) The systems shall be designed to provide the comfort temperatures and humidities as recommended by ASHRAE Standards.

b) Air handling systems shall conform to "Installation of Air Conditioning and Ventilating Systems," NFPA 90A–1976.

c) For spaces not exceeding 25,000 cubic feet in volume, heating, air conditioning, and ventilating systems shall conform to "Standard for the Installation

of Warm Air Heating and Air Conditioning Systems, NFPA 90–B, 1973, except return ducts shall be constructed of material equal to that specified for supply ducts, Chap. 2, paragraph 1.1., Duct Materials.

d) Outdoor air intakes shall be located as far as practical but not less than 15 feet from exhaust outlets of ventilation systems, combustion equipment stacks, medical-surgical vacuum systems, plumbing vent stacks or from areas which may collect vehicular exhaust and other noxious fumes.

e) All ventilation air outlets and inlets shall conform to NFPA 90A–Chapter 2, paragraph 3.2. Location of Outlets and Inlets.

f) The ventilation systems shall be designed and balanced to provide the ventilation and pressure relationships as shown in Table A.

g) The ventilation air supplied to the procedure rooms shall be delivered at or near the ceiling of the area served, and all exhaust or return air from the area shall be removed near the floor level. At least two exhaust outlets shall be used in each procedure room.

h) All central ventilation or air conditioning systems shall be equipped with filters having efficiencies not less than those specified in the following table:

### FILTER EFFICIENCIES FOR CENTRAL VENTILATION AND AIR CONDITIONING SYSTEMS IN AMBULATORY SURGICAL TREATMENT FACILITIES

| Area Designation | Minimum Number of Filter Beds | Filter Efficiencies (Percent) Filter Bed No. 1 | Filter Bed No. 2 |
|---|---|---|---|
| Procedure and Recovery Rooms | 2 | 25 | 90 |
| All Other Areas | 1 | 25 | — |

i) All filter efficiencies shall be average atmospheric dust spot efficiencies tested in accordance with the American Society of Refrigeration and Heating, Air Conditioning Engineers (ASHRAE) Standards 52–68.

j) For systems serving procedure and recovery rooms, filter bed No. 1 shall be located upstream of the conditioning equipment and filter bed No. 2 shall be located downstream of the supply fan and conditioning equipment including humidifiers.

k) Filter frames shall be durable and shall provide an airtight fit with the enclosing duct work. All joints between filter segments and enclosing duct work shall be gasketed or sealed to provide a positive seal against air leakage.

l) A manometer shall be installed across each filter bed serving procedure and recovery rooms.

m) Fire and smoke dampers shall be constructed, located and installed in accordance with the requirements of NFPA 90A.

n) All systems, regardless of size, which serve more than one smoke or fire zone, shall be equipped with smoke detectors to shut down fans automatically as specified in paragraph 4–3.1 of NFPA 90A.

o) The ventilation system for anesthesia storage rooms shall conform to the requirements of "Standard for Inhalation Anesthetics" NFPA 56A, including the gravity option ventilation system.

p) Boiler rooms shall be provided with sufficient outdoor air to maintain combustion rates of equipment and limit temperatures in working stations to 97° F Effective Temperature as defined by ASHRAE Handbook of Fundamentals.

q) Rooms containing heat-producing equipment, such as boiler rooms and heater rooms, shall be insulated and ventilated to prevent any floor surface above from exceeding a temperature of 100° F.

(Source: Amended at 6 Ill.Reg. 6220, effective May 17, 1982)

Section 205. TABLE A General Pressure Relationships and Ventilation Rates of Ambulatory Surgery Area

| Within Area Room Units Designation | Pressure Relationship to Adjacent Areas | Minimum Total Air Changes per Hour Supplied to Room | All Air Exhausted Directly to Outdoors | Recirculated |
|---|---|---|---|---|
| Procedure Room | + | 15 | Optional | No |
| Examination Room | 0 | 6 | Optional | Optional |
| Recovery Room | + | 6 | Optional | Optional |
| Medication Area | + | 4 | Optional | Optional |
| X–Ray Room | 0 | 6 | Optional | Optional |
| Soiled Workroom or Soiled Holding | – | 10 | Yes | No |
| Clean Workroom or Clean Holding | + | 4 | Optional | Optional |
| Darkroom | – | 10 | Yes | No |
| Toilet Room | – | 10 | Yes | No |
| Janitors' Closet | – | 10 | Yes | No |
| Sterilizer Equip. Rm. | – | 10 | Yes | No |
| Linen and Trash Rm. | – | 1– | Yes | No |
| Laboratory | – | 6 | Optional | Optional |
| Soiled Linen Storage | – | 10 | Yes | No |
| Clean Linen Storage | + | 2 | Optional | Optional |
| Anesthesia Storage | 0 | 8 | Yes | No |
| Central Services Area Soiled Area | – | 6 | Yes | No |
| Clean Area | + | 4 | Optional | Optional |
| Equipment Storage | 0 | 2 | Optional | Optional |

+ = Positive
– = Negative
0 = Equal

(Source: Amended at 6 Ill.Reg. 6220, effective May 17, 1982)